*884 OPINION
By the Court,
Springer, J.:
On June 1, 1994, Anthony Doyle, in association with two co-defendants, was charged with one count each of murder, conspiracy to commit murder, kidnaping, and sexual assault. Doyle pleaded not guilty to all charges. The State filed notice of intent to seek the death penalty. Doyle was bound over for trial on all counts, and, commencing January 3, 1995, the matter proceeded to jury trial. The jury found Doyle guilty of one count each of first-degree murder, conspiracy to commit murder, first-degree kidnaping, and sexual assault. The jury found several aggravating circumstances and imposed a sentence of death. In addition, the district court sentenced Doyle to consecutive life terms for first-degree kidnaping and sexual assault, respectively, and a concurrent six-year term of imprisonment for conspiracy to commit murder.
Doyle appealed, arguing that (1) the State violated his right to equal protection of the laws by using its peremptory challenges to eliminate black venirepersons from the jury pool; (2) there was insufficient evidence adduced at trial to support his convictions for first-degree kidnaping, conspiracy to commit murder and sexual assault; (3) the district court erred in failing to define “deliberate” as a separate, distinct element of first-degree murder; and (4) the district court erred in its instruction to the jury regarding “implied malice.”

FACTS

On January 16, 1994, the nude body of twenty-year-old Ebony Mason was discovered some twenty-five feet off the roadway in *885 an unimproved desert area of Clark County, Nevada. The woman’s body was found lying face down with hands extended overhead to a point on the ground where it appeared some digging had occurred. A four-inch twig protruded from the victim’s rectum. Three distinct types of footwear impressions were observed in the area, none of which matched the tread design of a pair of women’s athletic shoes located on the nearby dirt road. Also observed in the area was a hole containing a broken condom, a condom tip, an open but empty condom package, and two small packages of taco sauce.
In the opinion of the medical examiner, Mason died from asphyxia due to strangulation or blunt trauma to the head. The autopsy revealed nine broken ribs, multiple areas of external bruising, contusions, lacerations, abrasions, and a ligature mark on the anterior surface of the neck. Approximately 200 milliliters of fluid blood was found in Mason’s chest cavity. Mason’s back and chest bore a number of patterned contusions consistent with footwear impressions found at the crime scene. Finally, the autopsy revealed severe laceration of the head and subarachnoid hemorrhage (a thin layer of blood surrounding the brain) indicating blunt force trauma to the skull. Laboratory analysis revealed traces of the drug PCP in Mason’s system.
Michael Smith, who had been arrested in an unrelated matter, provided the police with the names of those he believed were responsible for the murder. Smith recounted statements made by Doyle regarding a killing to which Doyle claimed to have been a party. According to Smith, he and Doyle had overheard a girl tell some other people about her friend having been killed. At that time, Doyle commented to Smith that “we had to take someone out.” Doyle further stated that he, Darrin Anderson, Shawn Atkins, and “Bubba” Atkins were at Anderson’s house with a girl and that each had sex with the girl. While they were taking the girl home, she told the men that she was going to report them for rape and jumped from the truck in which they were riding. They were eventually able to coax the girl back into the truck and decided to kill her rather than face possible rape charges. The girl was apparently so inebriated or under the influence of drugs that she was oblivious to the direction the men were travelling. When they arrived at a remote area, the girl was pulled from the truck and choked. Unsuccessful in their attempt to choke her to death, the men then beat the girl. Finally, Doyle told Smith, two of the men held the girl down while the other repeatedly dropped a brick on her face until she died.
With information obtained from Smith, the police contacted Darrin Anderson, the owner of a small, yellow pickup truck. According to Anderson, on the night of January 15, 1994, he was *886 present with Doyle at the home of Shawn and “Bubba” Atkins. After arriving, the four left the Atkins residence to attend a nearby party. Anderson returned alone to the Atkins residence a short time later, and the other three returned thereafter in the company of Ebony Mason, who appeared inebriated or under the influence of drugs. Later, Mason asked for a ride home, and Anderson suggested that Doyle use Anderson’s truck. At approximately 10:30 p.m., Doyle left with Mason and the Atkins brothers in Anderson’s truck. Anderson awoke the next morning to find Doyle and the Atkins brothers asleep at the Atkins residence. When police later searched Anderson’s truck, they found a pair of blood-stained white socks between the seats.
Further information led investigators to contact Mark Wattley, another of Doyle’s friends. Wattley was present during a conversation where Doyle made statements describing how Shawn Atkins was unable to subdue Mason and how “Bubba” Atkins intervened “and hit her with a head punch and dropped her.” Thereafter, Doyle told Wattley that he (Doyle) began kicking Mason in the head. Eventually, one of the men grabbed a brick or rock and hit the girl in the head. At one point in the conversation, Doyle demonstrated how he (Doyle) jumped in the air and caused both of his feet to come down on Mason during the beating.
The police investigation eventually led to the execution of a search warrant at Doyle’s residence. During the search, the police impounded a pair of Adidas athletic shoes with soles that apparently matched treadwear impressions found at the crime scene and on Mason’s body. Doyle was then placed under arrest. After being advised of his Miranda rights, Doyle provided a statement to police explaining that he had been present when Mason was killed but that he did not participate in the killing. Later analysis of the impounded shoes confirmed that the tread-wear impressions were consistent with the footwear impressions retrieved from the scene of the crime and observed upon Mason’s body.
At trial, Doyle testified that on the night of January 15, 1994, “Bubba” Atkins brought Mason to the Atkins residence. Some time after her arrival, Mason asked for a ride downtown or home. Anderson then instructed Doyle to take Anderson’s truck and take Mason home. Doyle testified that Mason wanted to engage in sex with him and the Atkins brothers, so all four drove to Doyle’s apartment where each of the men had sex with Mason. Thereafter, the four left Doyle’s apartment in Anderson’s truck. Mason was riding in the back of the truck, and at some point, the truck stopped at a red light, and Mason jumped out of the truck. The Atkins brothers were eventually able to get Mason back in the truck, and the four proceeded to a deserted area outside Las Vegas.
*887 Doyle further testified that, once stopped, Shawn Atkins hit Mason in the face and a fight ensued. When it appeared that Shawn Atkins was unable to subdue Mason, “Bubba” Atkins came to his aid. Doyle denied any participation in the beating or killing, stating that he had watched from the back of the truck as Shawn and “Bubba” Atkins beat and kicked the girl. Later, while he and Shawn Atkins attempted to push start the truck, Doyle testified that he saw “Bubba” Atkins standing over Mason with a brick raised overhead. “Bubba” Atkins later discarded the brick in a garbage can. According to Doyle, “Bubba” Atkins was wearing the athletic shoes impounded by the police from Doyle’s apartment.

DISCUSSION

The Batson challenge.

Doyle, citing Batson v. Kentucky, 476 U.S. 79 (1986), claims that the State improperly used its peremptory challenges to remove black venirepersons from the jury pool in violation of his Fourteenth Amendment right to equal protection of the laws. The State contends that the reasons given for excluding the jurors were race neutral and did not constitute purposeful discrimination.
Batson and its progeny set forth a three-step process for evaluating race-based objections to peremptory challenges: First, the opponent of a peremptory challenge must make a prima facie showing of racial discrimination; second, the burden of production then shifts to the proponent of the strike to come forward with a race-neutral explanation; third, if a race-neutral explanation is tendered, the trial court must decide whether the opponent of the strike has proved that the proffered race-neutral explanation is merely a pretext for purposeful racial discrimination. Purkett v. Elem, ..... U.S. ....., ....., 115 S. Ct. 1769, 1770-71 (1995); see also Batson, 476 U.S. at 91-99.
1. Prima facie showing
To establish a prima facie case, the defendant first must show that he is a member of a cognizable racial group and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant’s race. Batson, 476 U.S. at 96. The trial court must then determine if an examination of all the relevant circumstances raises an inference that the prosecutor excluded venirepersons from the petit jury on account of their race. Id. For example, “a ‘pattern’ of strikes against black jurors *888 included in the particular venire might give rise to an inference of discrimination.” Id. at 97. The prosecutor’s statements may also be a relevant factor. Id.
In the present case, the State exercised two of its peremptory challenges to strike black venirepersons (Ms. Velasquez[1] and Ms. Samuels, respectively) from the panel and exercised its remaining six peremptory challenges to strike non-black venirepersons. A third black venireperson, Ms. Brown, was not stricken and remained on the panel. In the selection of alternate jurors, the State exercised its first peremptory challenge to remove the only black venireperson (Ms. Smith) from the alternate panel and waived its second challenge. Presumably the exclusion of three-out-of-four black prospective jurors is sufficient to make out a prima facie Batson violation; we need not decide this issue, however, because “[ojnce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot.” Hernandez v. New York, 500 U.S. 352, 359 (1991).
2. Race-neutral explanation
The next step under the Batson analysis is to determine whether the State has presented a race-neutral explanation in support of its exercise of the peremptory challenges against the black venirepersons. “Unless a discriminatory intent is inherent in the prosecutor’s explanation, the reason offered will be deemed race neutral.” Purkett, ..... U.S. at ....., 115 S. Ct. at 1771 (quoting Hernandez v. New York, 500 U.S. 352, 360 (1991)).
In the present case, the stated explanation for the exclusion of Ms. Samuels was that she currently had a brother serving a sentence for murder in the Louisiana State Prison. The stated explanation for the exclusion of Ms. Smith was that she had a brother who had served an unknown amount of time in the Nevada State Prison for robbery and probation violation, that her mother had been arrested, and that she believed police officers could be rough and rude. The State set forth its reasoning as follows:
*889 The State has to assume in reading this type of response that this person is going to harbor biases against the State; or if they don’t even feel that they are at the time, they certainly might be provoked by certain things that occur in the court proceedings, such as a police officer testifying, or having to address the sentencing of another individual for a violent crime which is something likely to occur in this case.
This court has previously held that “[association with the criminal justice system is a facially neutral reason to challenge veniremen.” Clem v. State, 104 Nev. 351, 355, 760 P.2d 103, 106 (1988), overruled on other grounds, Zgombic v. State, 106 Nev. 571, 798 P.2d 548 (1990). Accordingly, we conclude that the State has met its burden in presenting a non-discriminatory basis for striking Ms. Samuels and Ms. Smith.[2]
3. Pretext
“[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.” Purkett, ..... U.S. at ....., 115 S. Ct. at 1771 (citations omitted). If the prosecutor offers explanations that are facially neutral, a defendant may nevertheless show purposeful discrimination by proving the explanations pretextual. United States v. Joe, 938 F.2d 99, 102 (4th Cir. 1991). “If a prosecutor articulates a basis for a peremptory challenge that results in the disproportionate exclusion of members of a certain race, the trial judge may consider that fact as evidence that the prosecutor’s stated reason constitutes a pretext for racial discrimination.” Hernandez v. New York, 500 U.S. at 363.
Doyle argues that the State’s explanations were pretextual because the State left several non-black venirepersons on the jury who shared the same characteristics as the preempted black venirepersons. Doyle concedes, however, that “[o]f the 27 non African/Americans that were cleared for cause, none of them had a family member that had been in prison.” Moreover, the district court’s decision in this regard is discretionary and should ordi *890 narily be accorded great deference by the reviewing court. See Clem, 104 Nev. at 356 (citing Batson, 476 U.S. at 98 n.21). Accordingly, we conclude that the district court did not abuse its discretion in rejecting Doyle’s challenge on this basis.
Doyle also argues that the State’s explanations were pretextual because the criteria of having a family member that has been imprisoned disproportionately excludes blacks. Doyle points to the fact that at least fifty percent of the inmates incarcerated in Clark County are black.[3] As Doyle argued, unsuccessfully, to the district court: “[T]he fact that [one has] a family member who has been incarcerated in a prison is really a discriminatory criteria, because a much larger percentage of African/American individuals in Clark County, based on the percentage, have family members that are incarcerated in our prison system.” Doyle contends that “[a]n offered justification that has a significant disproportionate impact will rarely qualify as a legitimate, race neutral reason . . . because disparate impact is itself evidence of discriminatory purpose.” Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 265-266 (1977); Washington v. Davis, 426 U.S. 229, 242 (1976).
We believe that Doyle’s argument is not consistent with the Supreme Court’s equal protection jurisprudence. As recently reiterated by the Supreme Court:
A court addressing this issue must keep in mind the fundamental principle that “official action will not be held unconstitutional solely because it results in a racially disproportionate impact .... Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.” Arlington Heights v Metropolitan Housing Development Corp. 429 U.S. 252, 264-265 (1977); see also Washington v. Davis, 426 U.S. 229, 239 (1976).
Hernandez, 500 U.S. at 359-360. For example, Washington v. Davis, cited by Doyle, involved an unsuccessful disproportionate impact challenge to a qualifying test administered to applicants for positions as police officers. The Court held that use of the test did not violate the equal protection rights of blacks even though proportionately more blacks than whites tended to be disqualified by the test because (1) the fact of disproportionate impact alone did not demonstrate that blacks individually were being denied equal protection of the laws by application of the test and (2) the test was neutral on its face and could rationally be said to serve a *891 purpose that the government was constitutionally empowered to pursue. The Supreme Court explained the distinction between purposeful discrimination and disparate impact as follows:
Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another. It is also not infrequently true that the discriminatory impact — in the jury cases for example, the total or seriously disproportionate exclusion of Negroes from jury venires — may for all practical purposes demonstrate unconstitutionality because in various circumstances the discrimination is very difficult to explain on nonracial grounds. Nevertheless, we have not held that a law, neutral on its face and serving ends otherwise within the power of government to pursue, is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another. Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution. Standing alone, it does not trigger the rule that racial classifications are to be subjected to the strictest scrutiny and are justifiable only by the weightiest of considerations.
426 U.S. at 242 (citations omitted) (emphasis added).
In short, the Supreme Court upheld the test in Washington v. Davis, in spite of its disproportionate impact, because it established a valid and racially neutral qualification for employment. Id. at 245. Similarly, striking potential jurors who have relatives in the criminal justice system rationally serves the legitimate purpose of assuring a fair and impartial jury in criminal cases. As Doyle has offered no challenge to the legitimacy of this criteria other than that it has a disproportionate impact on blacks, we conclude that Doyle has not met his burden of proving that the State’s use of the above-mentioned criteria constitutes purposeful racial discrimination.

Sufficiency of the evidence

Doyle contends that the evidence presented at trial was insufficient to establish his guilt of the charges of first-degree kidnap-ing, conspiracy to commit murder, and sexual assault. The standard of review for sufficiency of evidence upon appeal, in a criminal case, is whether the jury, acting reasonably, could have been convinced of the defendant’s guilt beyond a reasonable doubt. Edwards v. State, 90 Nev. 255, 258-59, 524 P.2d 328, 331 (1974). It is the jury’s function, not that of the reviewing court, to *892 assess the weight of the evidence and determine the credibility of witnesses. Walker v. State, 91 Nev. 724, 726, 542 P.2d 438, 438-39 (1975).
1. First-degree kidnaping
Doyle contends that the evidence adduced at trial does not support his conviction for first-degree kidnaping, arguing that sufficient evidence corroborating his admissions relative to the offense was lacking.
The corpus delicti of a crime must be proven independently of the defendant’s extrajudicial admissions. Hooker v. Sheriff, 89 Nev. 89, 506 P.2d 1262 (1973). Thus, before the jury could find that Doyle kidnapped Ebony Mason, a case of willfiil detention for the purpose of committing sexual assault or murder must have appeared from evidence other than Doyle’s conversations with others. In People v. Alcala, 685 P.2d 1126 (Cal. 1984), cited by the State, the court described the nature and degree of independent proof required to corroborate a defendant’s admissions:
The independent proof may be circumstantial evidence . . ., and it need not be beyond a reasonable doubt. A slight or prima facie showing, permitting the reasonable inference that a crime was committed, is sufficient. If the independent proof meets this threshold requirement, the accused’s admissions may then be considered to strengthen the case on all issues.
Id. at 1136 (citations omitted). The court further stated:
There need not be independent support for each fact testified to by the suspect witness; corroboration is sufficient for this purpose if it “tends to connect the defendant with the commission of the offense [charged] in such a way as reasonably may satisfy a jury that the [witness] is telling the truth.” (E.g., People v. Holford (1965) 63 Cal. 2d 74, 82, 45 Cal. Rptr. 167, 403 P.2d 423, quoting People v. Lyons (1958) 50 Cal. 2d 245, 257, 324 P.2d 556 (overruled on other grounds, People v. Green, [], 27 Cal. 3d 1, 32-34, 164 Cal. Rptr. 1, 609 P.2d 468).) Circumstantial evidence is sufficient, “although such evidence ‘is slight and entitled, when standing by itself, to but little consideration.’” (Holford, [], quoting People v. McLean, (1890) 84 Cal. 480, 482, 24 P. 32).
Id. at 1136 n.10 (citations omitted). We conclude that sufficient circumstantial evidence of the offense of first-degree kidnaping exists to satisfy the corpus delicti doctrine.
*893 The offense of first-degree kidnaping is defined in pertinent part, as follows:
Every person who willfully seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away any person by any means whatsoever with the intent to hold or detain, or who holds or detains, the person for ransom, or reward, or for the purpose of committing sexual assault, extortion or robbery upon or from the person, or for the purpose of killing the person or inflicting substantial bodily harm upon him, or to exact from relatives, friends, or any other person any money or valuable thing for the return or disposition of the kidnaped person, ... is guilty of kidnap-ing in the first degree.
NRS 200.310(1). In addition, this court requires proof of asportation when the kidnaping is incidental to another offense where restraint of the victim is inherent with the primary offense. Hutchins v. State, 110 Nev 103, 108, 867 P.2d 1136, 1139-40 (1994); Clem v. State, 104 Nev. 351, 354, 760 P.2d 103, 105 (1988), overruled on other grounds, Zgombic v. State, 106 Nev. 571, 798 P.2d 548 (1990). Asportation is not required, however, where the victim is physically restrained. Clem, 104 Nev. at 354, 760 P.2d at 105. Also, the kidnaping is not incidental to the underlying offense if the restraint increased the risk of harm to the victim or had an independent purpose and significance. Id.
In the present case, Anderson testified at trial that he witnessed the victim voluntarily leave with Doyle and the others upon an offer to give her a ride home. Evidence of a struggle and the victim’s savagely beaten body were eventually discovered at a secluded desert location nowhere near the victim’s home. We believe that the evidence presented made it highly unlikely that Mason accompanied Doyle willingly to the death scene, and that, based on this evidence, the jury could reasonably have surmised that Doyle was telling the truth when he admitted to participation in the kidnaping. Moreover, the confinement and movement of the victim to a secluded, untravelled desert area was not merely incidental to the sexual assault and murder; it had the independent purpose and significance of substantially lessening the risk of detection.
Accordingly, we conclude that sufficient evidence was adduced at trial to establish the corpus delicti of first-degree kidnaping and, based on Doyle’s admissions, Doyle’s guilt beyond a reasonable doubt.
*894 2. Conspiracy to commit Murder
Doyle contends that the evidence adduced at trial does not support his conviction for conspiracy to commit murder, arguing that sufficient evidence corroborating his admissions relative to the offense was lacking.
A conspiracy is an agreement between two or more persons for an unlawful purpose. Peterson v. Sheriff, 95 Nev. 522, 598 P.2d 623 (1979). A person who knowingly does any act to further the object of a conspiracy, or otherwise participates therein, is criminally liable as a conspirator; however, “[m]ere knowledge or approval of, or acquiescence in, the object and purpose of a conspiracy without an agreement to cooperate in achieving such object or purpose does not make one a party to conspiracy.” State v. Arredondo, 746 P.2d 484, 487 (Ariz. 1987). “[Cjonspiracy is seldom susceptible of direct proof and is usually established by inference from the conduct of the parties.” Gaitor v. State, 106 Nev. 785, 790 n.1, 801 P.2d 1372, 1376 n.1 (1990) (quoting State v. Dressel, 513 P.2d 187, 188 (N.M. 1973)). In particular, a conspiracy conviction may be supported by “a coordinated series of acts,” in furtherance of the underlying offense, “sufficient to infer the existence of an agreement.” Id.
In addition, this court has held that to sustain a conviction of conspiracy, the prosecution is required to present proof, independent of the defendant’s own admissions, that the defendant entered into an agreement with at least one other person; however:
“[t]he corroborative evidence need not be sufficient, independent of the statements to establish the corpus delicti [but must] tend to establish the trustworthiness of the statement . . . and provide substantial independent evidence that the offense has been committed.” United States v. Todd, 657 F.2d 212, 216 (8th Cir. 1981), quoting Opper v. United States, 348 U.S. 84 (1954) and Smith v. United States, 348 U.S. 147 (1954).
Myatt v. State, 101 Nev. 761, 763, 710 P.2d 720, 722 (1985). In fact, proof of even a single overt act may be sufficient to corroborate a defendant’s statement and support a conspiracy conviction. United States v. Todd, 657 F.2d 212, 216 (8th Cir. 1981) (citing United States v. McCarty, 611 F.2d 220, 223 (8th Cir. 1979), cert. denied, 445 U.S. 930 (1980)).
In the present case, the State presented competent evidence that *895 Doyle left the Atkins residence together with the victim and the Atkins brothers. The area where the victim’s body was eventually found, and the nearby area where a struggle likely occurred, contained three distinct types of footwear impressions, one of which matched a pair of shoes retrieved from Doyle’s residence. The victim’s body also bore at least two, distinctly patterned contusions, one of which matched the pattern linked to the shoes found at Doyle’s apartment and a second design. None of the treadwear impressions or contusions matched the pair of women’s athletic shoes also found at the murder scene. This evidence, although perhaps insufficient in itself to establish the corpus delicti of conspiracy, provides substantial independent evidence of a conspiracy and tends to establish the trustworthiness of Doyle’s inculpatory statements regarding the alleged conspiracy. Accordingly, we conclude that Doyle’s conviction for conspiracy to commit murder was supported by sufficient evidence.
3. Sexual assault
Testimony adduced at trial indicated that a twig measuring four inches in length was found protruding from Mason’s rectum. This penetration is the sole basis of the instant sexual assault charge.[4] Doyle challenges the sexual assault conviction on the ground that there is not substantial evidence that the penetration preceded Mason’s death. The State contends (1) that substantial evidence was adduced at trial to establish that penetration occurred prior to death and (2) that pre-mortem sexual penetration is not a necessary element of sexual assault. This second question is one of first impression in Nevada.
a. Evidence of time of death
No testimony was adduced at trial fixing the time of death in relation to when the twig was inserted into the victim’s rectum. Smith testified that Doyle said that the brick was dropped repeatedly on Mason’s face “until she died.” Mason’s body was discovered some distance from the road, where the struggle *896 apparently took place. The twig matched the foliage in the area immediately surrounding the body. The medical expert estimated that Mason’s injuries, which were apparently inflicted during the struggle, were likely to have produced death within two-to-four minutes. The autopsy revealed no evidence of contusion, laceration, or other trauma associated with Mason’s rectum, evidence which would have supported the argument that she had been alive at the time of the penetration. Possible indications of digging located near Mason’s hands suggest that she may have still been alive after being dragged into the bushes. We conclude, however, that this evidence, by itself, is not sufficient to establish beyond a reasonable doubt that sexual penetration occurred while Mason was alive. In fact, the only reasonable conclusion, based on the available evidence, is that Mason was killed and her body then carried or dragged into the bushes and discarded face down on the pile of dead twigs and branches. Then, in a final act of depravity, the twig was inserted into her rectum.
b. Effect of peri-mortem sexual penetration on murder-rape conviction
Because the evidence adduced by the State is insufficient to discount the possibility that Mason was dead when the twig was placed in her rectum, we must now decide whether Nevada’s rape statute allows a conviction in instances where the evidence is sufficient to show only peri-mortem sexual penetration, that is that the sexual penetration occurred “at or around” the time of death.[5] Doyle urges this court to recognize that a live victim is a necessary element of sexual assault. In response, the State argues that it should be irrelevant whether sexual penetration occurred before, at, or soon after death.
Other jurisdictions are split on this issue.[6] According to the California Supreme Court:
*897 Rape requires a live victim. “Rape must be accomplished with a person, not a dead body. It must be accomplished against a person’s will. A dead body cannot consent to or protest a rape, nor can it be in fear of immediate and unlawful bodily injury [as required by section 261, subdivision (2)]. Penal Code section 263 provides, ‘[t]he essential guilt of rape consists in the outrage to the person and feelings of the victim of the rape . . . .’ A dead body has no feelings of outrage.”
People v. Kelly, 822 P.2d at 399 (quoting People v. Sellers, 250 Cal. Rptr. 345, 350 (Cal. Ct. App. 1974)) (additional citations omitted). The Kansas Supreme Court reached the same result after reviewing the language of Kansas’ rape statute:
K.S.A. 21-3502(1) begins, “Rape is sexual intercourse with a person.” “Person” implies a living person. The statute goes on to define the circumstances when sexual intercourse is rape (a) when the victim is overcome by force or fear; (b) when the victim is unconscious or physically powerless; (c) when the victim is incapable of giving consent because of mental deficiency or disease. All these circumstances require that the victim be living when the act of intercourse takes place.
State v. Perkins, 811 P.2d at 1150-51. The Georgia Supreme Court reached the opposite conclusion under its rape statute:
There is nothing in [the applicable code section] which precludes a finding of rape if the victim is not alive at the moment of penetration. What the jury must find is that the defendant had carnal knowledge of the victim “forcibly and against her will.”
“[A]gainst her will” has been interpreted to mean “without her consent,” and has been satisfied in cases in which the victim was drugged, asleep, unconscious, or in a coma. We see no reason why it should be any less applicable in a case *898 in which the defendant has rendered the victim permanently unconscious by killing her.
Lipham v. State, 364 S.E.2d at 842-43 (citations omitted). Tennessee expressly followed Georgia’s holding in Lipham, adding the following policy observation:
We are likewise unable to embrace the notion that the fortuitous circumstances, for the rapist, that death may have preceded penetration by an instant, negates commission of the crime of aggravated rape .... Reading the “live only” requirement into the statute encourages rapists to kill their victims, in our opinion.
Brobeck, 751 S.W.2d at 832. In a slightly different approach, the Massachusetts Supreme Court has recently held that “[i]n the circumstances of one continuous event, it does not matter whether the victim’s death preceded or followed the sexual attack.” Commonwealth v. Waters, 724 N.E.2d at 726; see also State v. Whitsell, 591 N.E.2d at 278 (“[T]he state was required to show that the victim was alive when the series of assaults began which ultimately resulted in the act of sexual penetration charged. It was not required to show that she was still alive at the completion of the sequence of events.”).[7]
*899 Although Nevada’s sexual assault statute provides little guidance in this regard, we conclude that the better reasoned interpretation is that the legislature intended “person” in the rape statute to mean a living human being. We believe that the indignities inflicted upon a corpse, although contemptible in their own right, are distinguishable from those inflicted upon the living, and we further believe that the legislature intended to recognize this distinction when it enacted Nevada’s necrophilia statute with its more flexible sentencing guidelines.
Moreover, we do not believe that recognizing a “live only” requirement for a rape conviction will encourage rapists to kill their victims or, as our dissenting colleague asserts, provides a “sentencing windfall” to a defendant who violently assaults his victim with the intent of committing sexual assault, but kills his victim before the act of sexual penetration is accomplished. In Parker v. State, 109 Nev. 383, 394, 849 P.2d 1062, 1069 (1993), this court affirmed a sentence of death after concluding that whether sexual penetration occurred post-mortem was irrelevant to the applicability of the murder-rape aggravating factor in that case. This court pointed out that NRS 200.033(4) “only requires a showing of an attempted sexual assault, not that the penetration must be completed in the victim’s lifetime.” Id. This court also concluded that “[t]he fact that the sexual intercourse occurred provides ample evidence that the assault against [the victim] was sexual in nature.” Id. A defendant who receives a death sentence plus a sentence for attempted rape plus a sentence for sexual penetration of a dead human body has certainly received no sentencing windfall. We also recognize that, under the same reasoning applied by this court in Parker, other states have held that a “live only” requirement need have no effect on the applicability of the felony- murder rule. See, e.g., People v. Kelly, 822 P.2d at 399-40 (Felony murder includes a killing committed in the perpetration of, or attempt to perpetrate, rape.). Although not raised in this appeal, presumably a similar result would be reached under Nevada law. See NRS 200.030(l)(b) (“Murder of the first degree is murder which is . . . committed in the perpetration or attempted perpetration of sexual assault.”).[8]
*900 Finally, had Doyle made a request for an instruction or a specific objection to the instruction given, the trial court should have instructed the jury that rape cannot take place after the victim is dead. We cannot say, however, that the instruction given was plain error. The instruction that was given required the jury to find that the sexual penetration occurred against the victim’s will and without her consent. We conclude that it was implicit in the instruction given that the victim be alive and that the instruction was therefore not improper.
For the reasons stated above, we conclude that Doyle’s conviction for sexual assault was not supported by substantial evidence.

The premeditation jury instruction

Doyle requests that this court overrule the holding in Powell v. State, 108 Nev. 700, 838 P.2d 921 (1992), as it relates to “premeditation” as an element of first-degree murder. In Powell, this court held that, as long as the jury instruction comports with the standard announced in Briano v. State, 94 Nev. 422, 581 P.2d 5 (1978), there is no need to define separately “deliberateness.” We conclude that this court’s reasoning in Powell remains sound and that there is, therefore, no need for this court to revisit the meaning of the phrase “deliberate, premeditated, and willful” at this time.

The “implied malice” jury instruction

The jury was instructed regarding implied malice according to the statutory definition provided in NRS 200.020(1) and (2).[9] *901 Doyle contends that the instruction created a mandatory presumption in favor of the State and improperly shifted the burden of proof to the defendant.
In Ruland v. State, 102 Nev. 529, 728 P.2d 818 (1986), this court expressly held that the above-mentioned jury instruction does not constitute an impermissible mandatory presumption. See also Guy v. State, 108 Nev. 770, 839 P.2d 578 (1992) (identical instruction held proper, although mandatory presumption issue not discussed). This court concluded that the instruction was constitutionally permissible because the instruction merely defines “implied malice” rather than directing the jury to find any presumed fact against the accused. Ruland, 102 Nev. at 533, 728 P.2d at 820-21.
Doyle notes that the opposite conclusion was reached in Fulghum v. Ford, 850 F.2d 1529 (11th Cir. 1988), cert. denied, 488 U.S. 1013 (1989), a case that involved statutory language identical to that contained in NRS 200.020. In Fulghum, the Eleventh Circuit Court of Appeal found that the implied malice instruction, standing alone, would have been constitutionally infirm. 850 F.2d at 1534 (citing Lamb v. Jernigan, 638 F.2d 1332 (11th Cir. 1982), cert. denied, 460 U.S. 1024 (1983)). However, the court concluded that any ambiguity regarding the State’s burden of proving malice beyond a reasonable doubt was cured by the presence of a “strong” circumstantial evidence instruction. Fulghum, 850 F.2d at 1535 (citing Lamb); see also Francis v. Franklin, 471 U.S. 307, 318-19 (1985) (“[T]he jury charge taken as a whole . . . explained the proper allocation of burdens with sufficient clarity that any ambiguity in the particular language challenged could not have been understood by a reasonable juror as shifting the burden of persuasion.”).
In Fulghum, the jury instructions provided: “To warrant a conviction upon circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused.” 850 F.2d at 1535. The jury instructions in the present case contained no such language. Jury Instruction No. 32, however, provided that “[t]he defendant is presumed innocent until the contrary is proved. This presumption places upon the State the burden of proving beyond a reasonable doubt every material element of the crime charged.” We believe that this court’s reasoning in Ruland remains sound. We also believe that, taken as a whole, the jury instructions in this case were sufficient *902 to cure any ambiguity that may have existed in the challenged jury instruction regarding the State’s ultimate burden of proving malice beyond a reasonable doubt. Accordingly, we conclude that under either Ruland or Fulghum, the challenged instruction was not improper.
Finally, we agree with the State that, even if this court finds that the instruction regarding implied malice impermissibly shifted the State’s burden of proving implied malice, the error was harmless because it is clear in this case that the jury actually rested its verdict on the ample evidence of express malice. See Scott v. State, 92 Nev. 552, 556, 554 P.2d 735, 738 (1976) (“The jury returned a verdict of murder in the first degree. They must have found beyond a reasonable doubt that [the defendant] murdered [the victim] deliberately, willfully, and with premeditation. These elements of the crime conclusively established express malice. . . . Thus, implied malice played no part in this case.”); Chapman v. California, 385 U.S. 18, 24 (1967); see generally Yates v. Evatt, 500 U.S. 391, 404 (1991) (“[T]he issue under Chapman is whether the jury actually rested its verdict on evidence establishing the presumed fact beyond a reasonable doubt, independently of the presumption.”).[10]

Mandatory statutory review

Finally, although Doyle has made no assignments of error regarding the penalty phase of his trial, pursuant to NRS 177.055, we conclude: (1) that the evidence fully supports the three aggravating circumstances found by the jury, namely, murder committed by a person under a sentence of imprisonment, murder committed by a person engaged in the commission of or an attempt to commit kidnaping, and murder committed to avoid or prevent a lawful arrest; (2) that the sentence of death was not imposed under the influence of passion, prejudice or any arbitrary factor; and (3) that the sentence is not excessive, considering both the crime and the defendant.

CONCLUSION

We conclude: (1) the State’s peremptory challenge of three out of four black venirepersons did not violate Doyle’s Fourteenth Amendment right to equal protection of the laws; (2) sufficient evidence was adduced at trial to support Doyle’s convictions of *903 first-degree kidnaping and conspiracy to commit murder, but insufficient evidence was adduced at trial to support his conviction of sexual assault; (3) the district court did not err in failing to define the term “deliberate” as a separate, distinct element of first-degree murder; and (4) the district court did not err in instructing the jury according to the statutory definition of “implied malice.”
For the foregoing reasons, we reverse Doyle’s conviction of sexual assault and vacate the related life sentence. Doyle’s remaining convictions and his sentence of death are affirmed.
Young, Shearing and Rose, JJ., concur.

The district court noted that Ms. Velasquez may or may not be black. Because resolving this issue dispositively would not change the conclusion reached herein, we assume arguendo that Ms. Velasquez is black.

The district court declined to order the State to provide an explanation for striking Ms. Velasquez, stating that an explanation of the State’s reasons was unnecessary in light of the fact that it was the State’s first peremptory challenge, and no pattern of racial exclusion was evident. We conclude that, after accepting the State’s explanation for the exclusion of Ms. Samuels and Ms. Smith, it was not error for the district court to refuse to require an explanation for the exclusion of Ms. Velasquez.

The district court apparently took judicial notice of this fact, although it rejected the merits of Doyle’s argument.

Sexual assault is defined in NRS 200.366(1) as follows:
A person who subjects another person to sexual penetration, or who forces another person to make a sexual penetration on himself or another, or on a beast, against the victim’s will or under conditions in which the perpetrator knows or should know that the victim is mentally or physically incapable of resisting or understanding the nature of his conduct, is guilty of sexual assault.
“Sexual penetration” includes: “any intrusion, however slight, of . . . any object manipulated or inserted by a person into the . . . anal opening of the body of another.” NRS 200.364(2).

At least one court has held that a defendant’s claim that the state failed to establish whether sexual penetration occurred prior to or after the death of the victim was not preserved for appellate review where defendant’s objection at trial was, like Doyle’s objection in this case, based on insufficiency of evidence of the rape and not on the rape of a dead body. See Smith v. Commonwealth, 722 S.W.2d 892, 893-94 (Ky. 1987). We can discern no means of determining the sufficiency of the evidence without first determining what precisely the jury was required to find; we are therefore not persuaded by the reasoning in Smith. Neither do we perceive any strategic advantage gained by Doyle in objecting to the sufficiency of the evidence rather than the instruction itself, as this court is now confined to reviewing the evidence in the light most favorable to the verdict. Hern v. State, 97 Nev. 529, 531, 635 P.2d 278, 278 (1981).

For examples of jurisdictions requiring a live victim for a rape conviction, see People v. Davis, 896 P.2d 119, 151 n.20 (Cal. 1995); People v. Kelly, 822 P.2d 385, 399 (Cal. 1992); State v. Perkins, 811 P.2d 1142, 1150- *897 1151 (Kan. 1991); Hines v. State, 473 A.2d 1335 (Md. Ct. Spec. App.), cert. denied 481 A.2d 239 (Md. 1984); People v. Hutner, 530 N.W.2d 174 (Mich. Ct. App. 1995); Rogers v. State, 890 P.2d 959 (Okla. Crim. App. 1995). For examples of jurisdictions not requiring a live victim for a rape conviction, see Lipham v. State, 364 S.E.2d 840 (Ga. 1988); Smith v. Commonwealth, 722 S.W.2d 892, 893-94 (Ky. 1987); Commonwealth v. Waters, 649 N.E.2d 724 (Mass. 1995); State v. Brobeck, 751 S.W.2d 828 (Tenn. 1988); State v. Whitsell, 591 N.E.2d265, 278 (Ohio Ct. App. 1990); State v. Collins, 585 N.E.2d 532, 536 (Ohio Ct. App. 1990). See generally Annotation, Fact that Murder-Rape Victim was Dead at Time of Penetration as Affecting Conviction for Rape, 76 A.L.R.4th 1147 (1990).

Several of the courts that do not require that a rape victim be alive at the instant penetration occurred nevertheless distinguish rape from sexual penetrations that implicate only the abuse of a corpse or necrophilia statutes. As the Georgia court noted in Lipham:
The facts here differ fundamentally from a case in which one happens upon the corpse of a female and engages in sexual intercourse with it. The use of force in the former and the absence of force in the latter is the difference. One is rape and the other necrophilia.
364 S.E.2d at 842-43. Whitsell also distinguishes rape and necrophilia by the absence of the use of force in the latter, adding further that had the sexual penetration taken place “substantially after the victim had died, appellant could legitimately argue that the assault constituted only an abuse of a corpse.” 591 N.E.2d at 278.
In Nevada, necrophilia is a crime under NRS 201.450, which provides:
1. A person who commits a sexual penetration on the dead body of a human being shall be punished by imprisonment in the state prison for life, with possibility of parole, beginning when a minimum of 5 years has been served, or by a fine of not more than $20,000, or by both fine and imprisonment.
2. A person convicted of a violation of subsection 1 shall not be granted probation or parole unless a psychologist licensed to practice in Nevada or a psychiatrist licensed to practice medicine in Nevada certifies that the person is not a menace to the health, safety or morals of others.
3. For the purposes of this section, “sexual penetration” means cunnilingus, fellatio or any intrusion, however slight, of any part of a person’s body or any object manipulated or inserted by a person into *899 the genital or anal openings of the body of another, including sexual intercourse in what would be its ordinary meaning if practiced upon the living.

We also do not agree with our dissenting colleague’s assertion that adoption of a “live only” requirement means that victims of imminent sexual assault, fighting and resisting to the end, are thought to suffer no indignity or outrage because they were killed by their attackers prior to being sexually *900 violated. The indignities suffered by such a victim are attempted rape, murder, and post-mortem sexual penetration. Moreover, our dissenting colleague’s assertion that, under the rule set forth in this decision, the cries of resistance, outrage, and fear of an intended victim of sexual assault who dies before the moment of sexual penetration “no longer count” makes no sense. Under this reasoning, the cries of an intended sexual assault victim who manages to escape her attacker before sexual penetration can occur, or whose attacker is unable or unwilling to commit the act of sexual penetration, also “no longer count.”
We also do not believe that NRS 201.450 — which is popularly known as the “necrophilia” statute, although that term appears nowhere in the text of the statute — is intended only to apply to medically classifiable “necro-philes.” The plain meaning of the statute is to punish the act of sexual penetration of a dead human body, regardless of motive.

NRS 200.020 provides:
1. Express malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof.
2. Malice shall be implied when no considerable provocation *901 appears, or when all the circumstances of the killing show an abandoned or malignant heart.

Yates sets out in detail the methodology for determining harmless error, consistent with the Due Process Clause, with respect to unlawful presumptions.