Springer, J.,
dissenting:
I agree with the majority’s conclusion that several instances of prosecutorial misconduct occurred in the case at bar. I cannot, however, accept, as does the majority, that the cumulative effect of these “several instances” of prosecutorial misconduct does not warrant reversal. The majority does not specify which of the many allegedly improper comments offered by the defendant are included among the “several instances,” but it is clear to me that, in light of the “less than overwhelming” evidence of guilt in this case, the majority cannot properly conclude that the misconduct was harmless. See Sipsas v. State, 102 Nev. 119, 125, 716 P.2d 231, 235 (1986).

FAILURE OF VICTIM TO IDENTIFY ASSAILANT

The most serious weakness in the State’s case is the victim’s inability to identify her assailant. The victim was never able to say: “That is the man that I saw assaulting me.” The victim’s testimony makes it very clear that she was unable to identify the man with whom she had sexual relations on the night in question. She accused Washington, her half brother, after the fact, and *1076 solely on the basis of her having eliminated other possible assailants and by reason of Washington’s having made the remark to her, “Just don’t tell anyone.” Washington claims that he said this to his stepsister because they had been drinking beer together, and because he was afraid that she was going to tell their parents.
If the victim in this case had ever been able to testify that she actually saw or heard or otherwise positively perceived Washington as the man who assaulted her on the night that she claims to have been assaulted, I would have no problem in affirming this conviction.[1] The victim, however, admits that at no time during her encounter with her assailant on that night was she able to see his face; and she certainly did not make any identification of her assailant until long after the event. In other words, she could not, at the time of the occurrence, identify her stepbrother as the person who assaulted her. The victim was never able to say that she saw or heard Washington on the night of the assault. It is quite clear that, at trial, the victim’s testimony was based entirely on an array of assumptions and not on a recollection of an actual perception that it was Washington who had assaulted her.
It is easy to understand why the victim was unable to identify Washington as being her assailant on the night in question. The victim was very intoxicated and was taking drugs at the time of the claimed sexual assault. In fact, she is not even sure that the event took place, admitting on a number of occasions that she “may have been dreaming.” The victim does remember that during the “dream” she asked her assailant, whoever he was, to don a condom.
It is also important to add that there were serious questions raised about the credibility of the victim’s testimony. She did not report the episode for several months after she claimed that it occurred; and the obvious parental opposition to her engaging in *1077 sexual conduct with her stepbrother gave her a strong motive to deny that she consented to the sexual activity. The victim had another, and perhaps stronger, motive to testify as she did. If she remained with her father, she would have had to attend Clark High School; but if she lived with her natural mother, then she would have been able to attend Cheyenne High School, where all of her friends were. Her father initially consented to her moving in with her natural mother, but he later told the victim that she could not do this because the natural mother’s living arrangement was not stable. Because of her father’s decision, the victim ran away from home. She eventually appeared at her natural mother’s house. Knowing that the victim had been reported to the police as a runaway, the natural mother took her to the police station. At the police station the victim was informed that she would be able to remain with her natural mother if she had been abused at her father’s house. It was at this time that the victim told the police that Washington had abused her at her father’s home.
Further, it should be noted that, according to the victim’s stepmother, when the victim and her natural mother first mentioned the incident to the victim’s stepmother, the victim described the sexual activity as being consensual. Finally, I would note that the victim’s sister was sleeping next to the victim, in the same bed, at the time of the incident. The sister did not wake up and had no knowledge that her sister was being raped in the same bed. All in all, this is a very strange and weak case from the prosecution standpoint; and, in light of the several instances of prosecutorial misconduct in this case, the conviction calls for reversal and a new trial.

PROSECUTORIAL MISCONDUCT

As recognized in the majority opinion, this case is infected by prosecutorial misconduct. The prosecutor personalized the case, telling the jury that he had a sympathetic understanding of what the victim in this case must have suffered because his wife had been the victim of a sexual assault. I might be able to overlook such a clearly-objectionable remark if this were not such a muddled case to begin with. It is difficult to argue that the prosecutor’s remarks in this case, taken in conjunction with the extreme weakness of the proof, did not unfairly prejudice the jury against Washington.

DENIAL OF A FAIR JURY

I believe also that the prosecution denied Washington equal protection of law by denying him a fair jury. The State used only one peremptory challenge, and the challenge was used to disqualify the only black, male juror who had been selected from the *1078 jury pool. Washington objected, claiming that the sole reason for the exclusion was the juror’s race or gender. The State argued that the juror was dismissed because he had no children, was uneducated (even though he graduated from high school and had several years of service in the army), and was a cook. However, the empaneled jury contained several members who had no children and who had no more than a high school education.[2]1 have no idea why the State would want to disqualify all cooks from the jury. I find the reason given to be unbelievable. While I realize that Purkett v. Elem, ..... U.S. ....., 115 S. Ct. 1769 (1995), interpreted Batson to require only a race-neutral explanation of why a given peremptory challenge is being made, “[i]f a race-neutral explanation is tendered [step 2], the trial court must then decide (step 3) whether the opponent of the strike has proved purposeful discrimination.” Id. at ......, 115 S. Ct. at 1770-71 (citations omitted). In other words, the court must determine whether the race-neutral explanation is pretextual (as it clearly is in this case). See, e.g., Hernandez v. New York, 500 U.S. 352, 363 (1991); U.S. v. Joe, 938 F.2d 99, 102 (4th Cir. 1991); Doyle v. State, 112 Nev. 879, 921 P.2d 901 (1996). In my opinion, the majority turns a blind eye to a transparently implausible race-neutral explanation for excluding the only black, male juror.
For the foregoing three reasons, I would reverse the conviction and remand to the trial court for a new trial.

When I say that the victim was “unable to identify” Washington, I mean that she did not know who the person was that she claims got into bed with her on the night in question. Whoever the man was that came into her bed, the victim was quite patient with him. At one point in the episode the unidentified assailant paused during his rapacious activities to engage in conversation on the bedside telephone. At another point, at her request, the man left the room and went searching for a condom. The victim was unable to see the face of the man who had gotten into bed with her and, consequently, could not tell at the time that it was her stepbrother. The identification was not made until later, when he told her “not to tell anyone.” Moreover, there is evidence that, when the victim finally did “put two and two together,” so to speak, she told her natural mother about it, saying that she had had consensual sexual contact with her stepbrother (although at trial the victim denied ever telling anyone that the sex was consensual). Whether it was caused by the “Mad Dog 20/20” or the medication that she was taking on that night, the fact is that the victim was not able, on the night in question, to identify her own stepbrother as the person who invaded the privacy of her bed.

It should also be noted that the jury did contain two black women.