*1131
 
 OPINION
 

 Per Curiam:
 

 On April 15, 1996, appellant Mario Thomas entered the Lone Star Steakhouse, his former place of employment, robbed the
 
 *1132
 
 manager, and killed two employees. Thomas was convicted of two counts of first degree murder with use of a deadly weapon, one count of robbery with use of a deadly weapon, one count of first degree kidnapping with use of a deadly weapon, one count of conspiracy to commit murder and/or robbery, and one count of burglary while in possession of a firearm, and received two death sentences for the murders. On direct appeal, Thomas raises many contentions, none of which warrant reversal.
 

 FACTS
 

 In March 1996, Thomas worked at the Lone Star Steakhouse in Las Vegas as a dishwasher until he was laid off from his job. Apparently Thomas had trouble showing up for work because he lived some distance away in Hawthorne with his wife, Angela Love Thomas.
 

 On Sunday, April 14, 1996, Thomas, Angela, and Angela’s fifteen-year-old brother, Kenya Hall, drove from Hawthorne to Las Vegas and arrived at the house of Thomas’ aunt, Emma Nash, and cousin, Barbara Smith. At about 7:30 a.m. on Monday, April 15, 1996, the three travelers drove to the Lone Star Steakhouse in order for Thomas to try to get his job back. The restaurant was closed to the public that early in the day. Angela waited in the car while Thomas, accompanied by Hall, entered the Lone Star. No discussion about robbery occurred at any time between Thomas and Hall. According to Thomas, he possessed a loaded 9-mil-limeter weapon. As they were walking toward the building from the parking lot, a delivery truck arrived nearby. Thomas expressed dismay and returned to the car to retrieve another loaded gun before approaching the building again. At this time, Thomas possessed both a loaded .32-caliber revolver and a loaded 9-milli-meter weapon.
 

 The two went to the back door where employees usually enter. Stephen Hemmes, a Lone Star employee, was leaving temporarily because he did not have work-appropriate shoes. Thomas and Hemmes spoke for a few minutes, and Thomas inquired as to who was acting as manager that morning. Hemmes replied that the manager was Vincent Oddo, and Thomas stated that he did not like Oddo. Thomas further asked when Hemmes would return; Hemmes answered that he would return in approximately twenty minutes, and he left. Thomas then knocked on the back door, and another employee, Matthew Gianakis, opened the door for them to enter.
 

 Thomas and Hall walked through the kitchen toward the manager’s office. Thomas knocked on the office door, and Oddo, who was on the phone, let them in. In Thomas’ videotaped confes
 
 *1133
 
 sion,
 
 [1]
 
 Thomas stated that he and Oddo discussed Thomas’ job, which led to an argument, and that Thomas left the office. Thomas further stated that he had no intent to commit robbery; however, he admitted that he returned to the office with Hall a minute later and pulled out his .32-caliber revolver. Thomas stated that Oddo became frightened and told Thomas and Hall to take whatever money they wanted. Despite the fact that Thomas admitted pointing the gun directly at Oddo, Thomas claimed that Oddo initiated the robbery by giving them money.
 

 Both Hall and Oddo testified that upon Thomas’ arrival at the manager’s office, Thomas immediately snatched the phone from Oddo’s hand, hung it up, and pulled out his .32-caliber revolver. Thomas pointed it directly at Oddo’s face and demanded that Oddo open the safe and give them the money. Oddo complied, and Thomas handed the gun to Hall and requested that Hall retrieve the money from Oddo. It is disputed whether Thomas told Hall to shoot Oddo. Although frightened and confused, Hall took the gun from Thomas, remained in the office with Oddo, took two or three bank bags of money from Oddo, allowed Oddo to run out of the building, and left to return to the car.
 

 After Thomas gave Hall the gun, but before any money exchanged hands, Thomas left the office because he knew that two employees and former co-workers, twenty-one-year-old Gianakis and twenty-four-year-old Carl Dixon, were “circling around.” According to Thomas’ videotaped confession, Thomas went to the men’s restroom, which was also a hangout for the employees, to find the two men. Upon entering the bathroom, Thomas saw Gianakis at the sink and Dixon in a stall. Thomas also observed that Gianakis had laid a meat-carving knife with a five- to seven-inch blade on the bathroom counter. Thomas blocked the door to prevent the two from leaving the bathroom while the robbery was taking place in the manager’s office. A struggle ensued between the three men, and Thomas picked up the knife and stabbed Dixon several times until Dixon fell to the floor. Meanwhile, Gianakis ran from the bathroom, and Thomas ran after him, stabbing him once in the front and once in the back.
 

 Evidence was also presented at trial that Thomas specifically enticed or attempted to entice the two victims into the bathroom. Hall’s testimony revealed that Thomas explained that he told Dixon he needed to talk in the bathroom. Once Dixon entered the bathroom with Thomas, Thomas began stabbing him. Thomas told Hall that he then called to Gianakis to join him in the bathroom, but Gianakis refused to enter. Then, according to Hall,
 
 *1134
 
 Thomas chased Gianakis around the corner and stabbed him twice.
 

 After returning to the car, Thomas asked Hall if Hall had killed Oddo. Upon learning that Hall had not, Thomas stated that Hall should have done so because “you’re not supposed to leave witnesses.” At some point, the money from Oddo’s office was transferred from the bank bags to a dark blue pillowcase.
 

 Oddo, who had escaped after giving Hall the money, ran across the street to call for help. Gianakis, who had just been stabbed twice, stumbled next door to a gas station/mini-mart and collapsed, dying shortly thereafter. Dixon’s dead body remained on the bathroom floor.
 

 The medical examiner testified at trial that Dixon suffered fifteen defensive stab wounds on his extremities and three to five severe stab wounds on his right chest about six inches deep, penetrating his heart, lungs, pulmonary artery, and aorta. The cause of Dixon’s death was multiple stab wounds. The medical examiner further testified that Gianakis suffered two fatal stab wounds, one to his chest and one to his back, penetrating both his heart and left lung. The cause of Gianakis’ death also was stab wounds.
 

 Thomas, Hall, and Angela returned to Nash and Smith’s house. Thomas told both Nash and Smith that if anyone asked, they should state that they had not seen him. Smith noticed that Thomas’ clothes and shoes were bloody. The blood on the clothes and shoes was later determined to be consistent with Dixon’s blood. Thomas gave Smith the money-filled pillowcase, and she started counting the contents. Thomas told her that “I did it” and that he had to take care of something and get rid of two people. He also stated to Nash that one of the two men got away (referring to Gianakis) and Thomas hoped that he (Gianakis) died. Thomas gave $1,000.00 to Smith to give to his mother, and he gave the .32-caliber revolver to Nash to give to her son. Thomas then changed his attire and took his bloody clothes and shoes, the knife used in the Lone Star bathroom, and the 9-millimeter gun into the desert beyond the house’s backyard. The police recovered all the items except for the 9-millimeter gun, which was never found.
 

 Thomas, Hall, and Angela packed the pillowcase containing the rest of the money into the car trunk and drove back to Hawthorne, where they were arrested. On April 22, 1996, Thomas and Hall were each charged with two counts of murder with use of a deadly weapon, and one count each of robbery with use of a deadly weapon, first degree kidnapping with use of a deadly weapon, conspiracy to commit murder and/or robbery, and burglary while in possession of a firearm. On June 27, 1996, Hall pleaded guilty to robbery with use of a deadly weapon and agreed
 
 *1135
 
 to testify against Thomas at all necessary proceedings. In exchange, the state dropped the remaining charges and agreed to argue for no more prison time than a two-to-fifteen-year prison term for robbery and a consecutive like term for the weapon enhancement. The agreements stated that if Hall violated the agreements, they would become null and void, and the state would be entitled to prosecute Hall on all the charges.
 

 On June 27, 1996, Hall testified at Thomas’ preliminary hearing. Thomas was bound over for trial on all the charges, and the state filed the information on July 2, 1996. The next day, the state filed its notice of intent to seek the death penalty against Thomas.
 

 On February 20, 1997, Hall filed a proper person motion to withdraw his guilty plea. On June 11, 1997, Hall’s attorney filed a motion to prevent Hall from being called to testify against Thomas at trial, invoking Hall’s Fifth Amendment right against self-incrimination. Because of Hall’s motion and intention not to testify at Thomas’ trial, on June 12, 1997, the state filed a motion to use Hall’s preliminary hearing testimony at Thomas’ trial. On June 13, 1997, without Thomas’ or his attorneys’ presence, the district court conducted a hearing on Hall’s and the state’s motions in order to determine whether Hall intended to renege on his agreement to testify. The court, however, specifically made no ruling because neither Thomas nor his attorneys were present.
 

 Thomas’ trial began on June 16, 1997. Outside the jury’s presence and after arguments by counsel, the district court granted both Hall’s motion not to testify and the state’s motion to use Hall’s preliminary hearing testimony. On the second day of trial, Thomas moved''for reconsideration of the court’s order. After more arguments, the court denied Thomas’ motion. Accordingly, Hall did not testify, and his preliminary hearing testimony was read into the record.
 

 The jury found Thomas guilty on all charges and, after the penalty phase, returned two sentences of death, expressly finding that no mitigating factors existed and finding six aggravating circumstances for each murder: (1) the murder was committed by a person who had been previously convicted of a felony involving the use or threat of violence: a December 6, 1990 judgment of conviction for attempted robbery; (2) the murder was committed by a person who had been previously convicted of a felony involving the use or threat of violence: a July 12, 1996 judgment of conviction for battery causing substantial bodily harm; (3) the murder was committed during the commission of a burglary; (4) the murder was committed during the commission of a robbery; (5) the murder was committed to avoid or prevent a lawful arrest; and (6) the defendant had, in the immediate proceeding, been convicted of more than one offense of murder.
 
 See
 
 NRS
 
 *1136
 
 200.033(2)(b), (4), (5), (12). Thomas was further sentenced to serve 72 to 180 months plus a consecutive 72-to-180-month term for robbery and the deadly weapon enhancement, two terms of life without the possibility of parole for kidnapping and the deadly weapon enhancement, 48 to 120 months for conspiracy, and 72 to 180 months for burglary. All terms were to run consecutively. The amended judgment of conviction was filed on September 16, 1997, and the notice of appeal was timely filed on September 9, 1997.
 

 DISCUSSION
 

 Guilt Phase Issues
 

 I.
 
 The district court did not err by permitting the state to use a peremptory challenge on an African-American male venire person
 

 During jury selection, four African-American potential jurors were excused from the venire panel for cause because they were not “death-qualified”; one African-American male, Kevin Evans, remained on the panel. When the state used a peremptory challenge to excuse Evans, the district court questioned the state’s motive and elicited a defense objection pursuant to Batson v. Kentucky, 476 U.S. 79 (1986). The prosecutor explained that he wanted to excuse Evans because Evans was young and inexperienced as a juror, he had a cavalier attitude and chewed gum in the courtroom, and he hesitated when asked if he could vote for the death penalty. The prosecutor emphasized that Evans’ race played no part in his decision to use the peremptory challenge. The district court overruled the
 
 Batson
 
 objection and permitted the state’s peremptory challenge of Evans. No African-American sat on the jury, and Thomas is African-American.
 

 On appeal, Thomas argues that the district court abused its discretion by permitting the peremptory challenge because, he contends, the state’s reasons were a mere pretext for a racially driven motive. Thomas asserts that the record does not reflect Evans’ cavalier attitude, gum chewing, or hesitation in stating that he could vote for the death penalty. Thomas further asserts that Evans’ young age should not have been a factor as he is old enough to be called for jury duty.
 

 Batson
 
 prohibits the state from using a peremptory challenge to exclude a potential juror based on race.
 
 Batson, 476
 
 U.S. at 84. The United States Supreme Court in Purkett v. Elem, 514 U.S. 765, 767 (1995), outlined the steps required for a
 
 Batson
 
 challenge: first, the opponent of a peremptory challenge must demonstrate a prima facie case of racial discrimination; second, the bur
 
 *1137
 
 den shifts to the proponent of the challenge to express a race-neutral explanation; and third, the trial court determines whether that explanation was a mere pretext and the opponent successfully proved racial discrimination.
 

 Here, the state concedes that a prima facie case was shown by its challenge to the only African-American person remaining on the jury panel and the district court’s
 
 sua sponte
 
 inquiry regarding racial motive. The first question is moot because the state offered an explanation for its challenge and the court ruled on the matter.
 
 See
 
 Doyle v. State, 112 Nev. 879, 888, 921 P.2d 901, 907 (1996) (holding that once steps two and three occur in a
 
 Batson
 
 analysis, the issue of whether a prima facie case exists is moot).
 

 We must therefore address the second step outlined in
 
 Purkett,
 
 whether the state presented a race-neutral explanation.
 
 Purkett
 
 held that a racially neutral reason need not be persuasive or even plausible.
 
 Purkett,
 
 514 U.S. at 767-68. A legitimate reason for excluding a juror “is not a reason that makes sense, but a reason that does not deny equal protection.”
 
 Id.
 
 at 769. Accordingly, “ ‘[ujnless a discriminatory intent is inherent in the prosecutor’s explanation, the reason offered will be deemed race neutral.’”
 
 Id.
 
 at 768 (quoting Hernandez v. New York, 500 U.S. 352, 360 (1991)). In this case, the state explained that Evans had a cavalier, immature attitude and did not appear to take this life-or-death proceeding seriously. Further, although he eventually responded in the affirmative,, the state explained that Evans expressed some hesitation when asked if he could vote for the death penalty. These reasons do not inherently contain any racial motive, and therefore, we conclude that step two is satisfied.
 

 With respect to the third step in
 
 Purkett,
 
 both the United States Supreme Court and this court have held that a trial court’s factual decision as to whether the state’s reasons were racially neutral is a discretionary one to be given great deference.
 
 Hernandez,
 
 500 U.S. at 364;
 
 Doyle,
 
 112 Nev. at 890, 921 P.2d at 908. In the current matter, the district court stated that the facts presented a close question, but decided that the state’s explanation was not pretex-tual. Based on our review of the record, we conclude that the court did not abuse its discretion and, therefore, did not err by permitting the peremptory challenge of Evans.
 

 II.
 
 The district court did not err by admitting Hall’s preliminary hearing testimony because Hall was “unavailable”
 

 Hall originally pleaded guilty and agreed to testify against Thomas at all proceedings. However, before Thomas’ trial, Hall
 
 *1138
 
 asserted his Fifth Amendment right against self-incrimination and refused to testify.
 
 See
 
 U.S. Const, amend. V. The district court determined that Flail validly asserted his Fifth Amendment right because he was seeking withdrawal of his plea and the court would not rule on the motion to withdraw his plea until after Thomas’ trial. Therefore, the district court granted Hall’s motion to not testify and the state’s motion to use Hall’s former testimony.
 

 Thomas argues on appeal that the court erred by admitting Hall’s preliminary hearing testimony because the judge did not “order” Hall to testify as required by NRS 171.198(6)(b), which provides:
 

 The [preliminary hearing] testimony so taken, may be used . . . [b]y the state if the defendant was represented by counsel or affirmatively waived his right to counsel, upon the trial of the cause, and in all proceedings therein, when the witness is sick, out of the state, dead, or
 
 persistent in refusing to testify despite an order of the judge to do so,
 
 or when his personal attendance cannot be had in court.
 

 (emphasis added);
 
 see
 
 Anderson v. State, 109 Nev. 1150, 1152, 865 P.2d 331, 333 (1993) (indicating the three requirements of using preliminary hearing testimony at trial: (1) the defendant was represented by counsel; (2) defendant’s counsel had an opportunity to cross-examine the witness at issue; and (3) the witness is unavailable).
 

 No dispute exists that Thomas was represented by counsel, that his attorney cross-examined Hall, or that Hall was persistent in refusing to testify. Thomas argues that Hall was not “unavailable” pursuant to NRS 171.198(6)(b) because the district court specifically stated.
 

 Well, I'm not going to order him to testify.
 
 [Hall] said he’s going to invoke his [F]ifth [A]mendment right. So he’ll have to — as far as I’m concerned, that’s what he did. That’s what he said on the — on record here, so I don’t think there is any purpose in it. That’s the end of that.
 

 (Emphasis added.) Because the court did not fulfill NRS 171.198(6)(b), Thomas argues that it could not admit Hall’s testimony. We disagree.
 

 First, just prior to the above-quoted statement by the district court, the prosecutor informed the court that it would have to order Hall to testify to fulfill the requirements of NRS 171.198(6)(b). In response, Thomas argued that the court could not order Hall to testify if Hall invoked his Fifth Amendment right on the stand. Thomas specifically explained that if that hap
 
 *1139
 
 pened, he would move for a mistrial. Thomas now argues that the court erred by failing to do something that he had previously argued the court could not do. Therefore, under these facts we conclude that the court’s failure to order Hall to testify is not a basis for reversal.
 
 See
 
 Milligan v. State, 101 Nev. 627, 637, 708 P.2d 289, 295-96 (1985) (holding that an error requested by the defendant is not a basis for reversal on appeal).
 

 Second, we conclude that Hall was in fact unavailable due to the invocation of his Fifth Amendment right not to testify.
 
 See
 
 Funches v. State, 113 Nev. 916, 919-23, 944 P.2d 775, 777-79 (1997); NRS 51.055(1)(a). The district court ruled that Hall invoked his Fifth Amendment right against self-incrimination and was therefore unavailable. Thomas argues for the first time on appeal that Hall did not have a Fifth Amendment right because Hall had already waived that right when he pleaded guilty and testified at the preliminary hearing. This argument is in direct opposition to what Thomas argued to the district court at the June 16, 1997 hearing. In arguing that the district court should not order Hall to testify, Thomas essentially conceded that Hall had a Fifth Amendment right to not testify by asserting the following scenario: if the district court later permitted Hall to withdraw his guilty plea, then by ordering him to testify at Thomas’ trial, the court would force Hall to incriminate himself. Accordingly, we will assume that Hall’s Fifth Amendment right existed, and we conclude that Hall was therefore unavailable pursuant to
 
 Funches,
 
 NRS 51.055(l)(a), and NRS 171.198(6)(b).
 
 [2]
 

 III.
 
 The prosecutor did not commit misconduct by refusing to grant Hall immunity so that he would be able to testify
 

 Thomas argues that the prosecutor committed misconduct by not granting Hall complete immunity so that Hall would be able to testify without incriminating himself. NRS 178.572 permits the court to grant a witness immunity “on motion of the state.”
 
 See also
 
 McCabe v. State, 98 Nev. 604, 606, 655 P.2d 536, 537 (1982) (“The granting of immunity is traditionally a function of the prosecution”). Additionally, this court has stated that a witness invoking his or her Fifth Amendment right against self-incrimination is not necessarily a ground for granting immunity.
 
 Id.
 
 Accordingly, the prosecution was not required to ask for immunity for Hall and did not commit misconduct by failing to
 
 *1140
 
 do so. Additionally, we note that Thomas has failed to allege any prejudice from admitting the preliminary hearing testimony instead of Hall’s live testimony. Thomas has not alleged, nor does the record reflect, that Hall recanted his prior testimony or would testify any differently than he did at the preliminary hearing.
 

 IV.
 
 The June 13, 1997 hearing conducted outside Thomas’ presence does not require reversal
 

 On June 13, 1997, the district court conducted a hearing on Hall’s motion to not testify against Thomas and the state’s motion to use Hall’s preliminary hearing testimony at Thomas’ trial. Neither Thomas nor his attorneys were present at this hearing. The hearing’s sole purpose was to determine Hall’s intentions and explain to Hall the consequences of his actions, and the court specifically stated that it could not make any rulings in Thomas’ and his attorneys’ absence. Accordingly, the district court deferred its ruling until June 16, 1997, when counsel for all parties were present at another hearing on the motions. At that time, Thomas’ counsel made extensive arguments against admitting Hall’s preliminary hearing testimony.
 

 Thomas asserts that NRS 178.388(1) was violated because he was not present at the June 13, 1997 hearing. NRS 178.388(1) states in pertinent part: “[T]he defendant must be present at the arraignment, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence.’ ’ Thomas argues that because the motions argued at the hearing regarded his trial, he should have been present.
 

 The very limited purpose of the June 13, 1997 hearing was to determine Hall’s intentions and ensure that he understood the consequences of his actions. The state did not argue in favor of its motion and specifically requested the court not to rule until Thomas was present. The district court did not make any ruling at that hearing. Thomas fully argued his position at the June 16, 1997 hearing, and again on June 17, 1997, when he requested reconsideration of the court’s decision to admit Hall’s testimony. Accordingly, we conclude that Thomas was not prejudiced by his absence at the June 13, 1997 hearing, and reversal is therefore unwarranted.
 

 V.
 
 The district court did not err by admitting autopsy photographs of the victims, Gianakis and Dixon
 

 During trial, Thomas objected to several autopsy photographs portraying Gianakis and Dixon. After arguments and a review of the photographs, the district court admitted some and excluded others. On appeal, Thomas admits that the photographs were pro
 
 *1141
 
 bative to demonstrate the victims’ wounds; however, he contends that unfair prejudice substantially outweighed that probative value because the photographs were inflammatory, gruesome, and duplicative.
 

 This court has repeatedly held that the district court’s decision to admit autopsy photographs, even gruesome ones, will be upheld absent an abuse of discretion.
 
 See, e.g.,
 
 Browne v. State, 113 Nev. 305, 314, 933 P.2d 187, 192,
 
 cert. denied,
 
 522 U.S. 877, 118 S. Ct. 198 (1997); Wesley v. State, 112 Nev. 503, 512-13, 916 P.2d 793, 800 (1996),
 
 cert. denied,
 
 520 U.S. 1126, 117 S. Ct. 1268 (1997). In this case, the autopsy photographs assisted the medical examiner in explaining the cause and circumstances of death. The district court carefully weighed the probative value against the risk of unfair prejudice and determined that the photographs were admissible. We therefore conclude that the court did not abuse its discretion.
 

 VI.
 
 The district court did not err by admitting an enlarged version of a previously admitted diagram depicting Dixon’s body
 

 During the medical examiner’s testimony, the district court admitted without objection a diagram depicting Dixon’s body and wounds. The state then moved to admit an exact but enlarged replica of that diagram, Thomas objected, and the district court admitted the enlarged diagram. Thomas argues on appeal that the court abused its discretion' by admitting the enlargement because it was cumulative and unnecessary pursuant to NRS 48.035(2).
 

 NRS 48.035(2) permits the district court to exclude evidence “if its probative value is substantially outweighed by considerations of undue delay, waste of time or needless presentation of cumulative evidence.” Here, the purpose of the normal-sized diagram was to illustrate the pattern and extent of Dixon’s stab wounds; the enlarged diagram ensured that the jury would be able to see the diagram while the medical examiner explained the wounds. Accordingly, we conclude that the district court did not err by admitting the enlarged diagram.
 

 VII.
 
 The district court did not err by denying Thomas’ motion for a mistrial after Nash inadvertently testified that Thomas had been in jail
 

 Nash, Thomas’ aunt, testified that she had asked Thomas, “[Hjave you done something that would put you back in jail?” In the jury’s absence, Thomas moved for a mistrial based on that
 
 *1142
 
 comment because the jury could infer that Thomas had a criminal record. The prosecutor informed the district court that he had instructed Nash not to reveal anything about Thomas’ criminal record, and Nash confirmed that. Nash stated that it was an inadvertent slip of the tongue. The district court denied Thomas’ motion and asked if defense counsel wanted the court to admonish the jury to disregard Nash’s comment. Defense counsel refused the offer.
 

 Thomas argues that the district court abused its discretion because Nash’s comment prejudiced him by implying that Thomas was convicted of a “serious crime” and the court did not provide an
 
 immediate
 
 admonishment to the jury. The test for determining whether a statement refers to prior criminal history is whether the jury could reasonably infer from the facts presented that the accused had engaged in prior criminal activity. Rice v. State, 108 Nev. 43, 44, 824 P.2d 281, 281 (1992). In the instant matter, Nash’s phrase “back in jail” could reasonably imply that Thomas had previously been involved in some sort of criminal activity, but does not indicate the seriousness of that crime. Accordingly, even if the jury inferred that Thomas had a criminal record, it could not determine from that comment alone whether he was convicted of a “serious crime.” While the comment constituted error, it was harmless because the evidence against Thomas was overwhelming, the comment was unsolicited by the prosecutor and inadvertently made, and Thomas declined the court’s offer to admonish the jury.
 
 See id.
 
 at 44, 824 P.2d at 282; Stickney v. State, 93 Nev. 285, 286-87, 564 P.2d 604, 605 (1977). Therefore, the district court did not abuse its discretion by denying Thomas’ motion for a mistrial.
 

 VIII.
 
 Sufficient evidence exists to support Thomas’ conviction on each count
 

 Thomas contends that insufficient evidence exists to support the jury’s verdict on his conviction for each count and the deadly weapon enhancement for murder and kidnapping. After a review of the record, we conclude that sufficient evidence exists to establish guilt beyond a reasonable doubt as determined by a rational trier of fact.
 
 See
 
 Wilkins v. State, 96 Nev. 367, 374, 609 P.2d 309, 313 (1980). The jury must determine the weight and credibility to give conflicting testimony, and its verdict will not be disturbed on appeal where sufficient evidence supports the verdict. Bolden v. State, 97 Nev. 71, 624 P.2d 20 (1981).
 

 
 *1143
 
 A.
 
 Burglary while in possession of a firearm
 

 Thomas argues that the evidence does not support a burglary conviction because he entered the Lone Star with the intent to get his job back, not to commit a felony. NRS 205.060(1) provides: “A person who, by day or night, enters any . . . building . . . with the intent to commit grand or petit larceny, assault or battery on any person or any felony, is guilty of burglary.’ ’
 
 See also
 
 NRS 205.060(4) (possession of a firearm during commission of a burglary).
 

 We conclude that the record demonstrates that Thomas intended to commit robbery when he entered the Lone Star. No dispute exists that Thomas entered the building with at least one loaded firearm. Evidence that Thomas asked Hemmes when he would return and that Thomas expressed discontent upon seeing a delivery truck near the Lone Star indicates that Thomas entered the building with the intent to commit a robbery and did not want extraneous people in the way. Further, Oddo’s and Hall’s testimony revealed that Thomas immediately thrust the gun in Oddo’s face and demanded money. We conclude that the jury could reasonably conclude that Thomas formed the intent to rob before entering the building, and therefore, sufficient evidence was presented to convict Thomas of burglary.
 

 B.
 
 Conspiracy to commit murder and/or robbery
 

 Thomas contends sufficient evidence of conspiracy does not exist because Hall testified that they had formed no express agreement to rob or murder upon entering the Lone Star.
 

 Conspiracy is an agreement between two or more persons for an unlawful purpose.
 
 Doyle,
 
 112 Nev. at 894, 921 P.2d at 911. “ ‘Conspiracy is seldom susceptible of direct proof and is usually established by inference from the conduct of the parties.’ ’’ Gaitor v. State, 106 Nev. 785, 790 n.1, 801 P.2d 1372, 1376 n.1 (1990) (quoting State v. Dressel, 513 P.2d 187, 188 (N.M. 1973)),
 
 overruled on other grounds,
 
 Barone v. State, 109 Nev. 1168, 866 P.2d 291 (1993). Therefore, if “a coordinated series of acts” furthering the underlying offense is “sufficient to infer the existence of an agreement,” then sufficient evidence exists to support a conspiracy conviction.
 
 Id.
 

 Here, the jury could infer that an agreement was formed between Thomas and Hall to commit robbery when Thomas handed the gun to Hall and instructed him to collect the money
 
 *1144
 
 from Oddo. Hall did collect the money and gave it to Thomas in the car. Further, without objection or interference, Hall observed Thomas bring a loaded gun into the Lone Star, point the gun at Oddo, and demand money. Accordingly, we conclude that Thomas’ and Hall’s conduct reasonably implies an agreement to commit robbery. However, the record does not reflect any evidence of an agreement between Hall and Thomas to commit murder. Nonetheless, the state satisfied its burden of proving the agreement to commit robbery, and the charging document states “conspiracy to commit murder
 
 and/or
 
 robbery.” (Emphasis added.) Therefore, the lack of an agreement to commit murder is inconsequential, and we affirm the conspiracy conviction.
 

 C.
 
 Robbery with use of a deadly weapon
 

 Thomas argues that because Hall collected the money from Oddo and Thomas did not remain in the manager’s office for the completion of the robbery, the evidence does not support his robbery conviction. We disagree. The record demonstrates that Thomas brought the loaded .32-caliber gun into the Lone Star, knocked on Oddo’s office door, pointed the gun directly at Oddo, and stated something about the safe and money. The fact that Thomas handed the gun to Hall and left the room does not negate Thomas’ involvement in the robbery, especially because Thomas instructed Hall to collect the money from Oddo. Further, Thomas later told Hall in the car that Hall should have killed Oddo to eliminate witnesses to the robbery. Accordingly, overwhelming evidence supports the robbery conviction.
 

 D.
 
 First degree kidnapping with use of a deadly weapon
 

 This charge is based on Thomas restraining Dixon in the men’s bathroom or enticing Dixon into the bathroom where he was murdered. NRS 200.310(1) provides in pertinent part that a first degree kidnapping occurs when “[a] person . . . willfully seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away a person by any means whatsoever with the intent to hold or detain, or . . . holds or detains, the person ... for the purpose of killing the person or inflicting substantial bodily harm upon him.”
 

 Thomas first asserts that just because Dixon’s body was found in the bathroom does not necessarily mean that Thomas enticed or decoyed Dixon into the bathroom for the purpose of killing him. Thomas fails to recognize that in his own videotaped confession, he admitted that he entered the bathroom and blocked the
 
 *1145
 
 door specifically to prevent Dixon (and Gianakis) from leaving. Therefore, the statute is satisfied because Thomas willfully confined Dixon in the bathroom with the intent to hold or detain him.
 
 See id.
 
 Additionally, according to Thomas, when Dixon tried to leave, Thomas prevented him from doing so by stabbing him several times, thus killing him. Therefore, Thomas did hold or detain Dixon for the purpose of killing him.
 
 See id.
 
 Moreover, evidence that Thomas enticed Dixon into the bathroom was also presented through Hall’s preliminary hearing testimony. Accordingly, sufficient evidence exists to support the kidnapping conviction.
 

 E.
 
 First degree murder with use of a deadly weapon
 

 NRS 200.030(1) provides in part: “Murder of the first degree is murder which is: (a) Perpetrated by . . . any other kind of willful, deliberate and premeditated killing; (b) Committed in the perpetration or attempted perpetration of . . . kidnaping, . . . robbery, [or] burglary . . .; or (c) Committed to avoid or prevent the lawful arrest of any person by a peace officer ...”
 

 Although Thomas could have been convicted of first degree murder under any one of these three theories, he argues that insufficient evidence exists only for premeditated murder under NRS 200.030(l)(a). Specifically, he argues that the evidence fails to show his specific intent to kill.
 

 We conclude that sufficient evidence exists to support Thomas’ conviction under the felony-murder and avoid-arrest theories.
 
 See
 
 NRS 200.030(l)(b) and (c). As discussed above, sufficient evidence exists that Thomas committed burglary, robbery and kidnapping, and Dixon and Gianakis were both killed during those crimes. Also, Hall testified that in the car after the incident, Thomas expressed his preference for not leaving witnesses when committing a robbery. Nash and Smith testified that Thomas explained that he had to get rid of two people. Accordingly, regardless of whether sufficient evidence exists under a premeditation theory, Thomas was properly convicted of first degree murder under either the felony-murder or avoid-arrest theories.
 
 [3]
 

 Moreover, sufficient evidence exists that Thomas committed premeditated murder. Premeditation need only occur for an instant. Scott v. State, 92 Nev. 552, 555, 554 P.2d 735, 737 (1976). Thomas confessed that he stabbed Dixon several times and Gianakis twice. The medical examiner testified that Dixon
 
 *1146
 
 was stabbed nineteen times.
 
 See
 
 DePasquale v. State, 106 Nev. 843, 848, 803 P.2d 218, 221 (1990) (“Premeditation and deliberation can be inferred from the nature and extent of the injuries, coupled with repeated blows”). The state also presented evidence that Thomas searched for Gianakis and chased him before fatally stabbing him. Additionally, Thomas later told his aunt, Nash, that he killed one man (Dixon), that the other (Gianakis) got away, and that Thomas hoped that he died. Taken together, the jury could reasonably conclude that Thomas premeditated the murders within moments of killing Dixon and Gianakis, even if he did not previously plan to kill them. Accordingly, sufficient evidence exists to support Thomas’ murder counts.
 

 F.
 
 Use of the knife as a deadly weapon
 

 Thomas argues that the meat-carving knife used in the murder and kidnapping was not a deadly weapon under the “inherently dangerous test” articulated in Zgombic v. State, 106 Nev. 571, 798 P.2d 548 (1990). “Inherently dangerous means that the instrumentality itself, if used in the ordinary manner contemplated by its design and construction, will, or is likely to, cause a life-threatening injury or death.”
 
 Id.
 
 at 576-77, 798 P.2d at 551;
 
 see also
 
 NRS 193.165(5)(a).
 
 [4]
 

 Here, the knife Thomas used to kidnap Dixon and kill both Dixon and Gianakis was a meat-carving knife with a five- to seven-inch blade. It is an inherently dangerous weapon due to the length of the blade and the sharpness required to carve meat.
 
 See
 
 Steese v. State, 114 Nev. 479, 499, 960 P.2d 321, 334 (1998) (a butcher knife with a five- to seven-inch blade used to carve meat is a deadly weapon as a matter of law under the “inherently dangerous test”). Accordingly, the knife used was a deadly weapon and could properly be used to enhance Thomas’ conviction for murder and kidnapping.
 

 
 *1147
 

 Penalty Phase Issues
 

 IX.
 
 The district court did not err by admitting certain prison documents
 

 Correctional officers Richard Johnson and Roger Edwards each testified at the penalty hearing as to Thomas’ behavior in prison during his previous incarcerations. Each testified that he knew incident reports and disciplinary findings forms were written and kept in the ordinary course of prison business and that he had previously written such reports. During their testimony, the state sought admission of several exhibits which were either incident reports or disciplinary findings forms concerning Thomas. Thomas objected to their admission because neither witness, Johnson or Edwards, was the custodian of records nor the person who completed the documents or had personal knowledge of the events described in them. The district court admitted the documents over Thomas’ authentication objections. Thomas argues on appeal that the court erred by admitting these “hearsay” documents because the persons who actually wrote the documents should have testified.
 

 Hearsay is generally permitted in a penalty phase.
 
 See
 
 NRS 175.552(3) (evidence may be presented during the penalty phase concerning “any other matter which the court deems relevant to sentence, whether or not the evidence is ordinarily admissible”). Additionally, we conclude that the documents were properly authenticated to be admitted under the business records hearsay exception in NRS 51.135, which provides:
 

 A memorandum, report, record or compilation of data, in any form, of acts, events, conditions, opinions or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, all in the course of a regularly conducted activity, as shown by the testimony or affidavit of the custodian or other qualified person, is not inadmissible under the hearsay rule unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.
 

 (Emphasis added.)
 

 Both Edwards and Johnson testified that the documents at issue were kept in the ordinary course of business, but admitted that they were not the custodian of records for these documents. Nevada law does not define what an “other qualified person” means for the purpose of authenticating a business record.
 

 The United States Court of Appeals for the Ninth Circuit has held that the authentication element is satisfied by “ ‘evidence
 
 *1148
 
 sufficient to support a finding that the matter in question is what its proponent claims.’” United States v. Workinger, 90 F.3d 1409, 1415 (9th Cir. 1996) (quoting Fed. R. Evid. 901(a)). The government need only make a prima facie showing of authenticity so that a reasonable juror could find that the document is what it purports to be.
 
 Id.
 

 A “qualified person” required to authenticate the writing has been broadly interpreted as anyone who understands the record-keeping system involved. United States v. Ray, 930 F.2d 1368, 1370 (9th Cir. 1990). For example, in People v. Champion, 891 P.2d 93, 111-12 (Cal. 1995),
 
 cert. denied,
 
 516 U.S. 1049 (1996), the California Supreme Court admitted as properly authenticated a form filled out by a police laboratory technician when a fingerprint expert testified about the procedures for completing those forms.
 

 In this case, although neither Johnson nor Edwards personally completed the documents in question, they both knew that the documents were kept in the ordinary course of business and the procedures for completing those writings. Therefore, based on persuasive federal and California authority, we conclude that the proper foundation was laid for the documents to fall under the business records hearsay exception. Accordingly, the district court did not abuse its discretion in admitting them.
 
 See
 
 People v. Beeler, 891 P.2d 153, 167-68 (Cal. 1995),
 
 cert. denied,
 
 516 U.S. 1053 (1996) (concluding that the trial court has wide discretion in determining whether sufficient foundation has been laid to qualify evidence as a business record).
 

 X.
 
 The death penalty was not excessive punishment and withstands the review required by NRS 177.055(2)
 

 Pursuant to NRS 177.055(2), this court must consider whether the evidence supports the aggravating circumstances, whether the sentence of death was imposed under the influence of passion, prejudice, or any arbitrary factor, and whether the sentence of death is excessive considering both the crime and the defendant. Thomas contends that this court must also conduct a proportionality review in comparison to other death cases. This latter contention is clearly without merit because the legislature repealed the proportionality review requirement in 1985. 1985 Nev. Stat. ch. 527, § 1, at 1597;
 
 see also
 
 Parker v. State, 109 Nev. 383, 395, 849 P.2d 1062, 1070 (1993).
 

 Thomas further contends that because he presented ample evidence in mitigation, the jury wrongfully concluded that no miti
 
 *1149
 
 gating circumstances existed. It is well established that the sen-tencer in a capital case must consider all mitigating evidence presented by the defense. Eddings v. Oklahoma, 455 U.S. 104, 114-15 (1982). In this case, the district court instructed the jury to consider the evidence Thomas presented in mitigation, and we presume that the jury followed the instructions and considered the evidence.
 
 See
 
 Lisle v. State, 113 Nev. 540, 558, 937 P.2d 473, 484 (1997) (“There is a presumption that jurors follow jury instructions”). By finding that no mitigating circumstances existed, the jury apparently concluded that the evidence presented in mitigation did not mitigate Thomas’ culpability for his crimes. Thomas fails to cite any authority which holds that a jury is required to find a mitigating circumstance when a defendant presents evidence in support of that circumstance. Accordingly, we conclude that no error occurred.
 

 We conclude that the aggravating factors were supported by sufficient evidence: Thomas was previously convicted of violent crimes, attempted robbery and battery causing substantial bodily harm; Thomas committed the instant murders while engaged in burglary and robbery; Thomas killed more than one person during this incident; and he killed them to avoid a lawful arrest as evidenced by his statement to Hall that he left no witnesses, his statement to Smith that he had to get rid of two people, and his statement to Nash that a witness got away and he hoped the witness died.
 

 The state presented substantial evidence detailing Thomas’ violent past, lack of conformance with society’s laws, and criminal behavior, including his conduct while incarcerated on his previous convictions. We conclude that the jury was not influenced by passion, prejudice, or any arbitrary factor when sentencing Thomas to death. We further conclude that the sentence of death was not excessive considering Thomas’ strong propensity toward violence and the brutal murders of two men who happened to be at the wrong place at the wrong time.
 
 [5]
 

 
 *1150
 

 CONCLUSION
 

 We conclude that none of Thomas’ contentions warrant reversal, and we affirm his conviction and death sentences.
 
 [6]
 

 [1]
 

 Thomas validly waived his rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), and admission of this videotape is not in dispute.
 

 [2]
 

 The state apparently decided not to void Hall’s plea agreement and instead contested his motion to withdraw his guilty plea for robbery with use of a deadly weapon. On September 4, 1997, the district court denied Hall’s motion and sentenced him to serve two consecutive terms of 60 to 150 months.
 

 [3]
 

 The jury also found as an aggravating circumstance in the penalty phase that the murders were committed to avoid or prevent Thomas’ lawful arrest.
 

 [4]
 

 Zgombic
 
 overruled the “functional test” adopted by Clem v. State, 104 Nev. 351, 357, 760 P.2d 103, 106-07 (1988). Thomas fails to recognize, however, that the legislature subsequently codified the functional test when it amended NRS 193.165 by adding subsection 5 in 1995. This test, pursuant to NRS 193.165(5)(b), defines a deadly weapon as “[a]ny weapon, device, instrument, material or substance which, under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing substantial bodily harm or death.” Either test may be used in crimes committed on or after October 1, 1995. 1995 Nev. Stat., ch. 455, §§ 1-2, at 1431. The crimes committed in the present case occurred on April 15, 1996, and therefore, the functional test also applies in this case.
 

 [5]
 

 Thomas failed to preserve in the district court his remaining arguments on appeal, and because no plain or patently prejudicial errors exist, we decline to consider these arguments. Hewitt v. State, 113 Nev. 387, 392, 936 P.2d 330, 333 (1997). Thomas’ remaining issues include: (1) whether the district court erroneously permitted the jury to be “death qualified”; (2) whether the district court erroneously instructed the jury during both the guilt and penalty phases; (3) whether the district court erroneously admitted cumulative evidence of Thomas’ prior bad acts during the penalty phase; (4) whether the district court erroneously admitted victim impact statements; and (5) whether the prosecutor committed misconduct during the penalty phase closing arguments.
 

 During oral arguments in this case, Thomas’ counsel objected to the state
 
 *1150
 
 counsel’s reference to California v. Brown, 479 U.S. 538 (1987), for failure to present this authority earlier. Because we have declined to consider the issue to which
 
 Brown
 
 pertains, we deny as moot Thomas’ motion to strike the state’s reference to that case.
 

 [6]
 

 The Honorable Miriam Shearing, Justice, voluntarily recused herself from the decision of this matter.