**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

ANTONIO LAVON DOYLE,

*Petitioner-Appellant*,

v.

TERRY ROYAL; LAS VEGAS METRO POLICE DEPARTMENT; ADAM PAUL LAXALT,

*Respondents-Appellees*.

No. 20-99013

D.C. No.
3:00-cv-00101-
RCJ-WGC

OPINION

Appeal from the United States District Court
for the District of Nevada
Robert Clive Jones, District Judge, Presiding

Argued and Submitted November 13, 2024
San Francisco, California

Filed December 2, 2025

Before: William A. Fletcher, Eric D. Miller, and Kenneth
K. Lee, Circuit Judges.

Opinion by Judge Miller;
Partial Dissent by Judge Lee

# SUMMARY[*]

## Habeas Corpus

The panel affirmed in part and vacated in part the district court's denial of a federal habeas petition filed by Antonio Lavon Doyle, a Nevada prisoner under sentence of death, in which he contends that the prosecutor violated *Batson v. Kentucky* by excluding three black prospective jurors during jury selection, and remanded.

The Nevada Supreme Court determined that once the peremptory strikes of two of those prospective jurors, Emma Jean Samuels and Angela Smith, were found to be nondiscriminatory, they did not need to be counted in assessing whether there was a pattern of racially discriminatory strikes. Then, examining in isolation the strike of Gwendolyn Velasquez, the first prospective juror struck, the Nevada Supreme Court determined that Doyle had not established a prima facie case of discrimination, so the prosecutor did not need to explain the basis for the strike.

The panel held that because the prosecutor gave credible, permissible reasons for striking Samuels and Smith that are confirmed by the record, the Nevada Supreme Court was not objectively unreasonable in upholding the trial court's determination that no intentional discrimination occurred as to those prospective jurors.

But the Nevada Supreme Court unreasonably applied *Batson* in holding that when a court finds that certain

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

prospective jurors were not excluded on the basis of their race, those jurors no longer count in assessing whether a defendant has established a prima facie case of discrimination with respect to other prospective jurors.

Because the Nevada Supreme Court unreasonably applied *Batson*, the panel resolved the claim without applying the deference AEDPA otherwise requires, and concluded that Doyle established a prima facie case as to Velasquez. The panel remanded to the district court to hold an evidentiary hearing to elicit the prosecutor's reasons for striking Velasquez. If the prosecutor offers a race-neutral reason for the strike, the court will proceed to the third step of the *Batson* analysis, where Doyle will bear the burden of establishing intentional discrimination.

Doyle also sought to assert claims that he conceded are untimely but as to which he argued the statute of limitations should be equitably tolled. Because the district court correctly denied equitable tolling, the panel affirmed the denial of habeas relief on those claims.

The panel declined to expand the certificate of appealability to cover additional claims.

Judge Lee partially dissented. He disagreed with the majority's conclusion that the Nevada Supreme Court unreasonably applied *Batson*, given the deferential standard of review. But he mainly wrote to highlight how this court's habeas jurisprudence has gone astray once it became unmoored from its historical basis. Too often now, state prisoners (whose guilt is not in doubt) exploit federal habeas petitions to tinker with the machinery of the state criminal justice system—and ultimately delay or deny justice.

## COUNSEL

Jocelyn S. Murphy (argued), Heather Fraley, and Benjamin A. Gerson, Assistant Federal Public Defenders; Rene L. Valladares, Federal Public Defender; Federal Public Defender's Office, Las Vegas, Nevada; for Petitioner-Appellant.

Heather D. Procter (argued), Chief Deputy Attorney General; Aaron D. Ford, Attorney General; Office of the Nevada Attorney General, Carson City, Nevada; Michael Bongard, Deputy Attorney General, Office of the Nevada Attorney General, Ely, Nevada; for Respondents-Appellees.

## OPINION

MILLER, Circuit Judge:

Antonio Lavon Doyle, a Nevada prisoner under sentence of death, appeals the district court's denial of his petition for a writ of habeas corpus. He contends that the prosecutor violated *Batson v. Kentucky* by excluding three black prospective jurors during jury selection. 476 U.S. 79 (1986). The Nevada Supreme Court determined that once the peremptory strikes of two of those prospective jurors were found to be nondiscriminatory, they did not need to be counted in assessing whether there was a pattern of strikes. Then, examining in isolation the strike of Gwendolyn Velasquez, the first prospective juror struck, the Nevada Supreme Court determined that Doyle had not established a prima facie case of discrimination, so the prosecutor did not need to explain the basis for the strike. Because that was an unreasonable application of *Batson*, we vacate in part and

remand to the district court for an evidentiary hearing to allow the State to provide its reasons for excluding Velasquez. In all other respects, we affirm the district court's denial of relief on Doyle's *Batson* claims.

Doyle also seeks to assert various claims that he concedes are untimely but as to which he believes the statute of limitations should be equitably tolled. The district court correctly denied equitable tolling, so we affirm its denial of habeas relief on those claims.

I

On January 16, 1994, Ebony Mason was found dead in a desert area of Clark County, Nevada. Mason had been badly beaten; the medical examiner determined that she died from strangulation or from a blow to the head. Michael Smith, who had been arrested in an unrelated case, told police that he believed Doyle was involved in the murder. According to Smith, Doyle had admitted to being part of a group of men who killed Mason after she threatened to report them for rape. Police contacted two of Doyle's friends, who corroborated aspects of Smith's account. Police then obtained a warrant to search Doyle's home, where they seized a pair of shoes with soles matching footwear impressions found at the crime scene and on Mason's body. Under questioning, Doyle admitted that he was present when Mason was killed but denied participating in the murder.

Doyle was arrested and charged with murder, conspiracy, robbery, kidnapping, and sexual assault. He pleaded not guilty.

During jury selection for Doyle's trial, the prosecutor used peremptory strikes to exclude three of the four black prospective jurors.

The prosecutor used his first peremptory strike against Gwendolyn Velasquez. Doyle objected, noting that he "consider[ed Velasquez] to be a minority" and asking that the prosecutor "explain . . . why Ms. Velasquez was challenged." The trial court refused to order an explanation, stating that it was "not going to get involved with this, because I don't think that there's been any pattern made. This was the first peremptory challenge made." The court added, "if this was the second or third person who had been excused peremptorily I would join quite readily with [Doyle's] objection and have the State deal with it. But so far it's only been the one."

During a subsequent recess, the trial court remarked that Emma Jean Samuels, a black prospective juror, was still in the jury box, but it "caution[ed] the District Attorney that if he continues, we may have to go on in [Doyle's] motion." The prosecutor then used a peremptory strike against Samuels. Doyle objected, and this time the trial court asked the prosecutor to respond. The prosecutor stated that Samuels "had two young children" and that a "mother of two young boys" might not "be in that frame of mind to sentence [Doyle] to death." When the trial court asked, "Don't we have other people who have the same problem?" the prosecutor agreed and moved to his "second point," namely, that Samuels had testified that her brother was serving a sentence for first-degree murder, and that because Doyle was also on trial for first-degree murder, Samuels would "be thinking about her brother in relationship to what she should do here in this courtroom, and it might put a little too much pressure on that woman." The trial court accepted that reasoning and overruled Doyle's objection. The prosecutor used his remaining peremptory strikes, and the jury was sworn in with one black juror, Janet Brown, on the panel.

When selecting alternates, the prosecutor used one of his two additional peremptory strikes on another black prospective juror, Angela Smith. After the alternates were selected and sworn, Doyle reminded the trial court that the prosecutor had excluded three of the four black prospective jurors. The prosecutor then provided his reasons for striking Smith. He referred to Smith's juror questionnaire response "concerning the experience of family members and those close to her with the criminal justice system," noting that she had stated that her mother and two of her brothers had been arrested. The prosecutor recalled that one of Smith's brothers was on probation for "[j]ust about everything," and that when Smith's mother was arrested for disturbing the peace, Smith believed that the police had acted "rough and rude with her own mother." He explained that in reviewing the juror questionnaires, he and his co-counsel "assessed a ranking on each one of the prospective jurors . . . from one to five—five being the most favorable to the State and one being the least favorable," and that Samuels "received a 'one' rating by myself when I went through her questionnaire, and that was before I even knew anything concerning her particular race." The trial court accepted that explanation and overruled Doyle's objection, concluding, "I don't find there's such an obvious intent only to have [non]black jurors."

Doyle repeated his request that the prosecutor explain his reasons for striking Velasquez, but the trial court declined to require an explanation.

The trial proceeded, and the jury found Doyle guilty of first-degree murder, conspiracy to commit murder, first-degree kidnapping, and sexual assault. Before the penalty hearing, one of the jurors became unable to serve, so an alternate juror was empaneled. After the penalty hearing, the

jury found that mitigating circumstances did not outweigh aggravating circumstances, and it voted to impose a sentence of death.

On direct appeal, the Nevada Supreme Court reversed Doyle's sexual-assault conviction, but it otherwise affirmed. *Doyle v. State*, 921 P.2d 901, 916 (Nev. 1996). It presumed that the exclusion of three of the four black prospective jurors was sufficient to make out a prima facie *Batson* violation. *Id.* at 907. It then noted that the prosecutor's justifications for excluding Samuels and Smith were facially neutral: The prosecutor said that he excluded Samuels because "she currently had a brother serving a sentence for murder in the Louisiana State prison," and that he excluded Smith because she "had a brother who had served an unknown amount of time in the Nevada State Prison for robbery and [a] probation violation, that her mother had been arrested, and that she believed police officers could be rough and rude." *Id.* at 908. As the court observed, "[a]ssociation with the criminal justice system is a facially neutral reason to challenge veniremen." *Id.*

The Nevada Supreme Court concluded that Doyle had not met his burden of showing that the prosecutor intentionally discriminated based on race. The court noted Doyle's concession that "[o]f the 27 [non-black prospective jurors] that were cleared for cause, none of them had a family member that had been in prison." *Doyle v. State*, 921 P.2d at 908. And it rejected Doyle's argument that striking jurors for "having a family member that has been imprisoned disproportionately excludes [black jurors]" such that it shows discriminatory purpose. *Id.*

As to the exclusion of Velasquez, the Nevada Supreme Court observed that the trial court had "declined to order the

State to provide an explanation for striking Ms. Velasquez" because "it was the State's first peremptory challenge, and no pattern of racial exclusion was evident." *Doyle v. State*, 921 P.2d at 908 n.2. The court reasoned that, "after accepting the State's explanation for the exclusion of Ms. Samuels and Ms. Smith, it was not error for the [trial] court to refuse to require an explanation for the exclusion of Ms. Velasquez." *Id.*

In 2000, after unsuccessfully pursuing state postconviction relief, *see Doyle v. State*, 995 P.2d 465 (Nev. 2000), Doyle filed a federal habeas petition. In 2008, after the completion of discovery, Doyle filed an amended petition. The district court granted Doyle's request to stay proceedings so that he could return to state court to exhaust certain claims. After the state courts rejected those claims, Doyle returned to federal court in 2016 and filed a second amended federal habeas petition.

The district court denied the petition. The court held that "the Nevada Supreme Court did not unreasonably apply *Batson* in ruling that Doyle did not show the peremptory challenges of Samuels and Smith to be purposefully racially discriminatory." And it held that the state court had reasonably "determined that, after the challenges of Samuels and Smith were found to be race-neutral, there remained only one challenge objected to by the defense, the Velasquez challenge, and therefore no pattern, and therefore no prima facie case of a *Batson* violation with respect to the Velasquez challenge."

The district court also dismissed various claims that Doyle asserted for the first time in his first and second amended petitions. The court noted that those claims were barred by the statute of limitations because they were

asserted more than one year after Doyle's conviction became final, and they did not relate back to the claims asserted in the timely original petition. The court rejected Doyle's argument that the statute of limitations should be equitably tolled.

The district court granted a certificate of appealability with respect to two issues: whether the State violated *Batson*, and whether Doyle is entitled to equitable tolling for his time-barred claims. *See* 28 U.S.C. § 2253(c).

## II

In *Batson*, the Supreme Court held that the Equal Protection Clause forbids a prosecutor from excluding potential jurors on the basis of their race. 476 U.S. at 89. When a defendant challenges a prosecutor's exercise of peremptory strikes under *Batson*, the challenge proceeds in three steps. *See Oliver v. Davis*, 25 F.4th 1228, 1231 (9th Cir. 2022).

"First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.'" *Johnson v. California*, 545 U.S. 162, 168 (2005) (quoting *Batson*, 476 U.S. at 93–94).

Second, "the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes." *Johnson*, 545 U.S. at 168 (quoting *Batson*, 476 U.S. at 94). This step "does not demand an explanation that is persuasive, or even plausible." *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (per curiam). Instead, the reason given will be deemed race-neutral unless a discriminatory intent is inherent in the explanation. *Id.*

Third, "the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." *Johnson*, 545 U.S. at 168 (omission in original) (quoting *Purkett*, 514 U.S. at 767). This step requires a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Batson*, 476 U.S. at 93 (quoting *Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)). It includes comparing the reasons given for striking black prospective jurors with the circumstances of others who remained on the panel. *Briggs v. Grounds*, 682 F.3d 1165, 1170 (9th Cir. 2012). "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination." *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005). The court "must examine the whole picture" based on "all of the relevant facts and circumstances" rather than analyze each strike in isolation. *Flowers v. Mississippi*, 588 U.S. 284, 314–15 (2019).

Because this case arises on federal habeas review of a state-court conviction, our review is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214. *See Lambert v. Blodgett*, 393 F.3d 943, 965 (9th Cir. 2004). Under AEDPA, a district court may not grant habeas relief with respect to any claim adjudicated on the merits in state court unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2).

A

We begin by considering the exclusion of Samuels and Smith, the two prospective jurors as to whom the state courts fully considered Doyle's *Batson* challenge. We note at the outset that Smith was only a prospective *alternate* juror. If no alternate jurors had been called to serve, any *Batson* violation in the exclusion of Smith would have been harmless. *See Nevius v. Sumner*, 852 F.2d 463, 468 (9th Cir. 1988). But because an alternate juror served during the penalty phase of trial, we consider the merits of Doyle's *Batson* challenge as to both Smith and Samuels. *See United States v. Esparza-Gonzalez*, 422 F.3d 897, 904 (9th Cir. 2005).

The Nevada Supreme Court concluded that Doyle did not show that the prosecutor intentionally excluded either Samuels or Smith based on race. *Doyle v. State*, 921 P.2d at 908–10. We must accept that conclusion unless it reflected an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see Oliver*, 25 F.4th at 1233.

Under AEDPA, "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010); *see Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). And when the determination involves an alleged *Batson* violation, "our standard is doubly deferential: unless the state appellate court was objectively unreasonable in concluding that a trial court's credibility determination was supported by substantial evidence, we must uphold it." *Jamerson v. Runnels*, 713 F.3d 1218, 1225 (9th Cir. 2013) (quoting

*Briggs*, 682 F.3d at 1170); *see Sifuentes v. Brazelton*, 825 F.3d 506, 518 (9th Cir. 2016).

The prosecutor offered two reasons for striking Samuels. The trial court correctly noted that the first reason—that she "had two young children"—is belied by a comparative juror analysis because several other potential jurors also had young children. But the prosecutor's second reason—that Samuels stated that her brother was serving a sentence for first-degree murder—was valid. The record shows that no prospective juror other than Samuels had a family member who had been convicted of murder, the crime for which Doyle was tried, nor did any other prospective juror have a family member serving a life sentence. *See Jamerson*, 713 F.3d at 1228 ("Comparative analysis therefore supports the justification proffered, as no seated juror possessed the trait that the prosecutor identified as the reason for the strike.").

To be sure, that the prosecutor initially offered a reason that turned out to be invalid could perhaps have been a reason to doubt the prosecutor's credibility in offering a second reason. *See Purkett*, 514 U.S. at 768; *cf. Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) ("Proof that [an] explanation is unworthy of credence is . . . one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive."). But even if "[r]easonable minds reviewing the record might disagree about the prosecutor's credibility, . . . on habeas review that does not suffice to supersede the trial court's credibility determination." *Oliver*, 25 F.4th at 1236 (quoting *Rice v. Collins*, 546 U.S. 333, 341–42 (2006)). The trial judge was not unreasonable in finding that the prosecutor's justification for challenging Samuels was genuine.

As to Smith, the prosecutor explained that he excluded her because she had several family members with numerous encounters with the criminal justice system, including a brother who had more than one criminal conviction. He also referenced her belief that the police had mistreated her mother when they arrested her. And he further explained that he had rated Smith's questionnaire as a "one" out of five—the lowest possible rating—before knowing her race.

The record confirms that although Smith said she had neutral feelings toward the criminal justice system, she held negative views toward law enforcement based on her mother's experience, and she had numerous family members who had more extensive contact with the criminal justice system than the family members of any other prospective jurors. Other than Brown—a black prospective juror who was seated on the jury—Samuels and Smith were the only prospective jurors with family members who had been incarcerated for violent felonies.

Doyle argues that the prosecutor engaged in disparate questioning because he did not thoroughly question Smith about her relatives' criminal-justice contacts. In Doyle's view, the prosecutor's limited questioning suggests that his professed concerns with those contacts were pretextual. But in fact, the prosecutor questioned Smith extensively about the circumstances surrounding her mother's and brother's encounters with the criminal justice system as well as whether Smith could be impartial despite their experiences.

Doyle also emphasizes that basing peremptory challenges on family associations with the criminal justice system may have a disparate impact on black prospective jurors. We have held, however, that having relatives with a criminal history can be a valid, race-neutral reason for

excluding prospective jurors. *Sifuentes*, 825 F.3d at 527. *Batson* prohibits only intentional discrimination; disparate impact is relevant to a *Batson* analysis only to the extent that it is "circumstantial evidence of purposeful discrimination." *Jamerson*, 713 F.3d at 1225; *see Hernandez v. New York*, 500 U.S. 352, 362 (1991) (plurality opinion). After weighing all the relevant facts, the trial court here reasonably determined that Doyle had not established purposeful discrimination.

Because the prosecutor gave credible, permissible reasons for striking Samuels and Smith that are confirmed by the record, the Nevada Supreme Court "was [not] objectively unreasonable in upholding the trial court's determination" that no intentional discrimination occurred. *Sifuentes*, 825 F.3d at 518; *see Miller-El*, 537 U.S. at 340.

B

The exclusion of Velasquez is different because the state courts did not determine that Doyle failed to establish intentional discrimination. Instead, they determined that Doyle did not establish a prima facie case of discrimination at the first step of *Batson*, and they ended the inquiry there.

The Nevada Supreme Court discussed the exclusion of Velasquez in a footnote, stating that "after accepting the State's explanation for the exclusion of Ms. Samuels and Ms. Smith, it was not error for the [trial] court to refuse to require an explanation for the exclusion of Ms. Velasquez." *Doyle v. State*, 921 P.2d at 908 n.2. That statement could be read to mean that the trial court was entitled to consider each prospective juror in turn: Because Velasquez was the first prospective juror excluded, Doyle could not show that her exclusion was part of a pattern, and the trial court was not required to revisit her exclusion even after later strikes

established a pattern of race-based strikes. At least one court of appeals has noted "the want of authority directly addressing the issue of whether a trial judge faced with multiple *Batson* challenges is required to revisit earlier *Batson* challenges." *Higgins v. Cain*, 720 F.3d 255, 267 (5th Cir. 2013); *see Batson*, 476 U.S. at 99 ("declin[ing] . . . to formulate particular procedures to be followed" in evaluating *Batson* challenges); *Johnson*, 545 U.S. at 168.

We need not decide whether such a procedure would be consistent with *Batson* because the State does not read the footnote that way. Instead, the State made clear at oral argument that it understands the Nevada Supreme Court to have held that when a court finds that certain prospective jurors were not excluded on the basis of their race—as the trial court did with respect to Samuels and Smith—then those jurors no longer count in assessing whether a defendant has established a prima facie case of discrimination with respect to other prospective jurors.

We accept the State's interpretation of the Nevada Supreme Court's decision. Reading the decision the way the State does, we conclude that it reflects an unreasonable interpretation of *Batson*.

As we have already explained, at step one of *Batson*, a defendant must establish a prima facie case that the prosecutor has exercised peremptory strikes in a discriminatory manner; at step two, the prosecutor must offer a race-neutral explanation of the strikes; and at step three, the trial court must determine whether the defendant has established intentional discrimination. 476 U.S. at 93–94. Significantly, *Batson* itself makes clear that "a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury *solely* on

evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial." *Id.* at 96 (emphasis added); *see id.* at 97 (explaining that "a 'pattern' of strikes against black jurors . . . might give rise to an inference of discrimination"). The Nevada Supreme Court's rule contravenes that principle by making the existence of a prima facie case depend *not* solely on "the prosecutor's exercise of peremptory challenges" but instead on the additional evidence developed at steps two and three. It also contravenes the Supreme Court's statement that "[w]e did not intend the first step to be so onerous that a defendant would have to persuade the judge—on the basis of all the facts, some of which are impossible for the defendant to know with certainty—that the challenge was more likely than not the product of purposeful discrimination." *Johnson*, 545 U.S. at 170. And it disregards the Supreme Court's admonition that the three steps of *Batson* are distinct and should not be combined. *See Purkett*, 514 U.S. at 768 ("The Court of Appeals erred by combining *Batson*'s second and third steps into one.").

Under the view adopted by the Nevada Supreme Court, prosecutors would have a free pass to exclude one black prospective juror because of race, no questions asked. As long as they could adequately explain their exclusion of other black prospective jurors, the defendant would not be able to establish a prima facie case—and thus would not be able to demand an explanation—for the remaining strike. *But see United States v. Chalan*, 812 F.2d 1302, 1314 (10th Cir. 1987) (noting that in certain cases, a single peremptory challenge might establish a prima facie case of discrimination). That is not a reasonable application of *Batson*. "In the eyes of the Constitution, one racially discriminatory peremptory strike is one too many." *Flowers*,

588 U.S. at 298; *accord Snyder v. Louisiana*, 552 U.S. 472, 478 (2008).

The State identifies no court, other than the Nevada Supreme Court, that has adopted its interpretation of *Batson*. And we have expressly rejected such an interpretation. In *Johnson v. Finn*, the prosecutor used three peremptory challenges against black jurors, but the magistrate judge found that two of the challenges were supported by "genuine race-neutral reasons." 665 F.3d 1063, 1071 (9th Cir. 2011). We observed that the fact "[t]hat a defendant fails to meet his burden at step three does not mean that he failed to meet his burden at step one." *Id.* We therefore disagreed with the suggestion "that this ultimate conclusion as to two jurors negates the district court's finding of a prima facie case of racial discrimination as to all three black jurors." *Id.* at 1072. Exactly the same is true here.

We acknowledge that section 2254(d)(1) prescribes a highly deferential standard of review of state-court decisions when challenged in federal habeas petitions: "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). But for the reasons we have explained, the Nevada Supreme Court's decision cannot withstand scrutiny even under that standard.

Because the Nevada Supreme Court unreasonably applied *Batson*, we must "resolve the claim without the deference AEDPA otherwise requires." *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007). Doing so, we conclude that Doyle established a prima facie case as to Velasquez.

"The fact that a prosecutor peremptorily strikes all or most veniremembers of the defendant's race . . . is often sufficient on its own to make a *prima facie* case at Step One." *Shirley v. Yates*, 807 F.3d 1090, 1101 (9th Cir. 2015); *see also Paulino v. Castro*, 371 F.3d 1083, 1091 (9th Cir. 2004) (holding that "a defendant can make a prima facie showing based on statistical disparities alone"). Here, the Nevada Supreme Court correctly acknowledged that "the exclusion of three-out-of-four black prospective jurors is sufficient to make out a prima facie *Batson* violation," *Doyle v. State*, 921 P.2d at 907, but it erred when it discounted that statistical disparity just because it ultimately found two of the removals to be nondiscriminatory. *See Williams v. Runnels*, 432 F.3d 1102, 1107 (9th Cir. 2006) (concluding that strikes of three of four black prospective jurors created a statistical disparity sufficient to make a prima facie showing).

The State makes little effort to challenge that conclusion except to argue that Doyle did not show that Velasquez was black. It is true that the trial court did not make an express finding as to Velasquez's race. But the record makes clear that Doyle and the trial court both believed Velasquez to be black. Indeed, the prosecutor appears to have shared that belief: In noting that Velasquez was the first juror he had challenged, he suggested that "[h]ad we excluded a white, perhaps it would have been a pattern of excluding Caucasians"—a use of the conditional mood that would make sense only if he also believed that Velasquez was not white. The parties' shared perception is sufficient for purposes of *Batson*. *See Nguyen v. Frauenheim*, 45 F.4th 1094, 1102 n.3 (9th Cir. 2022) ("A *Batson* challenge focuses on the perception of the race or ethnicity of the prospective jurors, not their actual race or ethnicity.")

That leaves the question of the appropriate relief. Doyle asks us to remand to allow the district court to hold an evidentiary hearing to conduct a full *Batson* analysis as to Velasquez, and the State agrees that that is the appropriate remedy. We recognize that AEDPA restricts the availability of evidentiary hearings in federal habeas proceedings: "A habeas petitioner must meet two conditions to be entitled to a federal evidentiary hearing: (1) allege facts which, if proven, would entitle him to relief, and (2) show that he did not receive a full and fair hearing in a state court, either at the time of the trial or in a collateral proceeding." *Karis v. Calderon*, 283 F.3d 1117, 1126–27 (9th Cir. 2002); *see Alberni v. McDaniel*, 458 F.3d 860, 873 (9th Cir. 2006). Doyle satisfies both requirements. He alleges that the prosecutor purposefully excluded Velasquez based on race. If that allegation is true, then Doyle is entitled to relief. *See Batson*, 476 U.S. at 100. And as we have explained, although Doyle made out a prima facie case and requested multiple times that the prosecutor explain his reasons for striking Velasquez, the trial court—and later, the Nevada Supreme Court—failed to hold the prosecutor to his burden. That deprived Doyle of a full and fair hearing.

Accordingly, we remand to the district court to hold an evidentiary hearing to elicit the prosecutor's reasons for striking Velasquez. *See Williams*, 432 F.3d at 1109–10; *see also Williams v. Taylor*, 529 U.S. 420, 434–35 (2000) (holding that the bar on evidentiary hearings set out in 28 U.S.C. § 2254(e) does not apply if the petitioner pursued his claim diligently in state court); *Shinn v. Ramirez*, 596 U.S. 366, 382 (2022) (same). If the prosecutor offers a race-neutral reason for the strike, the court will proceed to the third step of the *Batson* analysis, where Doyle will bear the

burden of establishing intentional discrimination. *Johnson*, 545 U.S. at 168.

### III

We now turn to Doyle's claim that the district court erred in dismissing, as untimely, the claims he asserted for the first time in his first and second amended petitions.

AEDPA provides that "[a] 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court." 28 U.S.C. § 2244(d)(1). The limitations period begins to run upon "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review," *id.* § 2244(d)(1)(A), but it is tolled for "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending," *id.* § 2244(d)(2); *see Branham v. Montana*, 996 F.3d 959, 962 (9th Cir. 2021).

Doyle's conviction became final in 1996, and he promptly pursued state postconviction relief. Those proceedings concluded in 2000, and Doyle filed a federal habeas petition soon thereafter. The claims asserted in that petition—including the *Batson* claims we have already discussed—were therefore timely. What is disputed here are the claims that Doyle did not assert until 2008 and 2016, when he filed his first and second amended petitions.

Federal Rule of Civil Procedure 15(c)(1) provides that an amended pleading "relates back to the date of the original pleading" if it "asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Until 2005, we

understood that rule to mean that the relevant "transaction" for purposes of an amended habeas petition is the petitioner's "trial and conviction in state court," so that any claim relating to the petitioner's conviction would relate back to the original petition and would be considered timely as long as the original petition was filed within the limitations period. *Felix v. Mayle*, 379 F.3d 612, 615 (9th Cir. 2004), *rev'd*, 545 U.S. 644 (2005). In *Mayle v. Felix*, however, the Supreme Court rejected our interpretation of Rule 15, holding that an amended habeas petition "does not relate back (and thereby escape AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." 545 U.S. 644, 650 (2005).

Doyle concedes that, under *Mayle*, the claims he asserted for the first time in 2008 and 2016 do not relate back to the claims in his original petition. Instead, he argues that the statute of limitations should be equitably tolled. We review that argument de novo. *See Spitsyn v. Moore*, 345 F.3d 796, 799 (9th Cir. 2003).

A habeas petitioner is entitled to equitable tolling if he shows that "'he has been pursuing his rights diligently, and . . . that some extraordinary circumstance stood in his way' and prevented timely filing." *See Holland v. Florida*, 560 U.S. 631, 649 (2010) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). A petitioner must show diligence "not only while an impediment to filing caused by an extraordinary circumstance existed, but before and after as well, up to the time of filing his claim in federal court." *Smith v. Davis*, 953 F.3d 582, 599 (9th Cir. 2020) (en banc).

Doyle cannot meet that standard. He maintains that he is entitled to equitable tolling because he reasonably relied on

the district court's scheduling orders, which allowed discovery, set time limits for an amended petition, and stated that the amended petition should "contain all known grounds for relief." Although the order provided him time to take discovery, he does not say that the discovery was necessary to allow him to bring the claims—that is, he does not argue that he is entitled to statutory tolling because "the factual predicate of the claim or claims presented could [not] have been discovered through the exercise of due diligence" until the completion of discovery. 28 U.S.C. § 2244(d)(1)(D). Instead, he maintains that under the district court's order, he was not required to file an amended petition until discovery was complete. But as the district court later observed, the scheduling orders said nothing about the statute of limitations, so they in no way "affirmatively misled" Doyle about the timeliness of any claims he might assert. *Ford v. Pliler*, 590 F.3d 782, 786 (9th Cir. 2009). The court's orders did not "prevent[] timely filing." *Holland*, 560 U.S. at 649.

To be sure, until *Mayle* was decided, Doyle might have believed that he could rely on our permissive interpretation of Rule 15's relation-back standard and that he faced no time limit for asserting new claims in an amended petition. That legal mistake might support tolling for the period before *Mayle* was decided. *See Williams v. Filson*, 908 F.3d 546, 557–61 (9th Cir. 2018). But it cannot support tolling for the period after *Mayle* clarified the proper interpretation of Rule 15. Doyle did not file his first amended habeas petition promptly after *Mayle* was decided: Instead, he waited almost three years to file. That lack of diligence precludes tolling. *See Smith*, 953 F.3d at 598–99.

Doyle emphasizes that the State did not immediately invoke the statute of limitations, but that does not alter his own lack of diligence. He also suggests that his counsel's

failure to file an amended petition more promptly constitutes "egregious" attorney misconduct that might justify equitable tolling. *Holland*, 560 U.S. at 650. That suggestion, of course, is in considerable tension with his simultaneous claim that his counsel acted reasonably. Be that as it may, we think counsel displayed "garden variety . . . neglect" in the form of inattention to developments in the law governing relation back, but not egregious misconduct. *Irwin v. Department of Veterans Affs.*, 498 U.S. 89, 96 (1990); *see Maples v. Thomas*, 565 U.S. 266, 281–83 (2012). Notably, although many of Doyle's claims were dismissed on procedural grounds, his counsel still developed 12 claims that were not. Given the absence of "extraordinary circumstances," Doyle is not entitled to equitable tolling, so we affirm the district court's decision dismissing his untimely claims. *Holland*, 560 U.S. at 653.

\*     \*     \*

Doyle asks us to expand the certificate of appealability to cover various additional claims, some of which the district court rejected as unexhausted and others of which it rejected on the merits. We decline to expand the certificate of appealability because Doyle has not shown that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also* 28 U.S.C. § 2253(c)(2); *Gonzalez v. Thaler*, 565 U.S. 134, 140–41 (2012).

**AFFIRMED in part, VACATED in part, and REMANDED.**

LEE, Circuit Judge, partially dissenting.

This habeas petition presents a close call on a novel *Batson* peremptory challenge question. I ultimately disagree with the majority's conclusion that the Nevada Supreme Court unreasonably applied *Batson*, given our deferential standard of review. But I mainly write to highlight how our habeas jurisprudence has gone astray once it became unmoored from its historical basis. Too often now, state prisoners (whose guilt is not in doubt) exploit federal habeas petitions to tinker with the machinery of the state criminal justice system—and ultimately delay or deny justice.

Under English common law, the writ of habeas corpus traditionally served as a shield against unlawful and arbitrary detention by the king. In the United States, the original understanding of habeas corpus was just as limited: It merely allowed a detainee to challenge the jurisdiction of courts. It was not until 1953 that the Supreme Court opened the habeas floodgates, allowing state prisoners to collaterally attack convictions on constitutional grounds.

So today, a defendant convicted in state trial court can appeal to a state appellate court. Then he can seek direct review from the state supreme court and potentially the U.S. Supreme Court. If his appeal fails, he may file a habeas petition in state court. And if that does not succeed, he can appeal the denial to the state appellate court. Finally, he is onto the state supreme court again and the U.S. Supreme Court. After all that, the prisoner can start all over again with a habeas petition in federal district court, then to a federal circuit court, and finally back to the U.S. Supreme Court.

As a practical matter, this means that a federal habeas petition may not reach our desks until decades after the

conviction. This is what happened here: Antonio Doyle brutally murdered a woman 31 years ago and was sentenced to death 30 years ago after being found guilty of murder. There is little doubt he did it. But now, we are partially granting his habeas petition and ordering an evidentiary hearing in which the State must explain the reason for striking a single juror from a trial three decades ago.

But the presiding trial judge died 28 years ago. The prosecutor—who is almost 80 years old today—tried dozens, if not hundreds, of cases during his long career as a deputy district attorney. The chances that he will remember the reason for striking a single juror 30 years ago are likely slim. If he cannot articulate a reason, Doyle's conviction will probably be vacated. And who knows if the State still has sufficient evidence to retry Doyle, especially if witnesses have passed away or evidence has been destroyed.

This makes little sense. The "Great Writ" (as William Blackstone once called it) should not be a "get out of jail card" for convicted state prisoners like Doyle whose guilt is not in doubt. I respectfully dissent in part.

## BACKGROUND

### I. Doyle rapes and murders Ebony Mason—and confesses.

In January 1994, law enforcement discovered the nude body of 20-year-old Ebony Mason nearby an isolated roadway. She had been sexually assaulted before being killed: Someone had jabbed a four-inch twig into her rectum and left multiple used condoms. The police also found several footprints nearby. The medical examiner believed that Mason had died due to strangulation or blunt trauma to

the head. She had suffered nine broken ribs, severe bruising, and lacerations across her body.

Michael Smith, who had been arrested on an unrelated incident, told the police that he knew the men responsible for this murder. He said that Antonio Doyle admitted that he, along with three other men, each had sex with a woman. When she said that she would report them for rape, they decided to kill her. They tried choking her but when she did not die, they beat her and repeatedly dropped a brick on her face.

As the police continued their investigation, they talked to Mark Wattley, one of Doyle's friends who was not involved in the sexual assault or murder. Wattley said that Doyle confessed to helping kill Ms. Mason, including by jumping up in the air and kicking her in the head. The police then searched Doyle's residence and found a pair of shoes matching the tread impressions found at the crime scene. Doyle admitted to the police that he was there when Ms. Mason was killed but claimed he did not participate in the murder.

In January 1995, a jury found Doyle guilty of, among other things, first-degree murder and sentenced him to death. On direct appeal, the Nevada Supreme Court affirmed his conviction and death sentence in 1997 but reversed the conviction for sexual assault because the prosecution had not proven that Ms. Mason was alive when she was raped. Doyle petitioned for rehearing, which the Nevada Supreme Court rejected.

## II. After being convicted, Doyle embarks on a 30-year habeas campaign.

In 1997, Doyle filed his first state habeas petition, which the state court denied after holding an evidentiary hearing. The Nevada Supreme Court affirmed the denial of habeas in 2000.

Doyle then filed his first federal habeas petition in 2000 and engaged in extensive discovery. With help from a court-appointed lawyer, Doyle filed an amended habeas petition in 2008. When the State moved to dismiss it, Doyle asked for a stay, stating that he intended to exhaust some of his claims in state court. The federal district court granted the stay in 2009.

Doyle then went back to state court in 2009 with his second state habeas petition. The state trial court denied it. The Nevada Supreme Court again rejected it, too. He unsuccessfully sought a rehearing before the state high court and then failed in convincing the U.S. Supreme Court to grant a writ of certiorari.

In 2016, Doyle was back in federal court, which lifted the stay on his federal habeas petition after his state habeas petition had failed. He filed yet another amended habeas petition, which the State moved to dismiss. The federal district court dismissed the petition in part and rejected his motion for reconsideration. The district court then issued a certificate of appealability, allowing Doyle to present his appeal to us.

One of Doyle's claims before us is a *Batson* challenge. During voir dire, the prosecutor exercised his first peremptory challenge against Gwendolyn Velasquez, a woman whom the parties presumed was black. She

presented a somewhat mixed bag for the State: While she had a friend who is a former police officer, she was with a family member when that relative was arrested for shoplifting. Judge Addelair Guy III—who was the first black person to be admitted to the Nevada bar and then became the first black judge in the state[1]—did not require the prosecutor to explain his basis for striking Ms. Velasquez. "At this stage of the game I'm not going to get involved with this, because I don't think that there's been any pattern made. This was the first peremptory challenge made; there are several other African-Americans [in the remaining jury pool]." The prosecutor later challenged two other African-American jurors; the court asked the reasons for the strikes and accepted them. Doyle's counsel later requested that the court require the State to explain its basis for striking Ms. Velasquez but the trial court declined. Ultimately, the jury had one black juror and found him guilty of murder.

## DISCUSSION

### I. The Nevada Supreme Court did not unreasonably reject Doyle's *Batson* claim.

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a federal court can grant a habeas petition only if a state decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A state court decision is

---

[1] *See* Johnnie Rawlinson, *A Mentor to All: Addeliar D. "Dell" Guy, III*, Judicature (January, 2015), https://judicature.duke.edu/articles/eighth-judicial-district-court-of-clark-county-nevada-judge-addeliar-d-dell-guy-iii-a-mentor-to-all/.

"reasonable" if any "fairminded jurist" could agree with it. *See Harrington v. Richter*, 562 U.S. 86, 101 (2011).

Doyle's petition raises the novel question of whether the State must provide a reason for striking a minority juror if he or she is the first one to be challenged and thus no pattern of exclusion exists.**[2]**   The Nevada Supreme Court found no error under *Batson v. Kentucky*, 476 U.S. 79 (1986).  It noted that Judge Guy:

> declined to order the State to provide an explanation for striking Ms. Velazquez, stating that an explanation of the State's reasons was unnecessary in light of the fact that it was the State's first peremptory challenge, and no pattern of racial exclusion was evident.  We conclude that, after accepting the State's explanation for the exclusion of Ms. Samuels and Ms. Smith, it was not error for the court to refuse to require an explanation for the exclusion of Ms. Velasquez.

Admittedly, the Nevada Supreme Court's analysis is vague and cursory.  I believe this is a close call but ultimately think the Nevada Supreme Court did not err, given AEDPA's deferential standard of review.

There is no "clearly established" Supreme Court precedent requiring the state court judge to revisit an earlier objection when there are sequential *Batson* challenges.  To the contrary, the Supreme Court has deferred to state courts on how to apply *Batson*: "We decline however to formulate

---

[2]  I agree with the majority that Doyle's other claims fail.

particular procedures to be followed upon a defendant's timely objection to a prosecutor's challenges," given the "variety of jury selection practices followed in our state and federal trial courts." *Batson*, 476 U.S. at 99-100 & n.24.[3] If we were to decide this issue on direct appeal, I may well agree with the majority. But under AEDPA, I do not think the Nevada Supreme Court acted unreasonably or contrary to established Supreme Court precedent.

## II. Our habeas jurisprudence has veered from its historical basis.

Doyle does not genuinely dispute his guilt in his habeas petition. He instead argues that he is entitled to a new trial decades later because Judge Guy—a pioneering African-American judge in Nevada—supposedly erred in not revisiting the peremptory challenge of a single black juror. And by granting his petition, we have ordered the prosecutor to testify at an evidentiary hearing and recall the reason he chose to strike Ms. Velasquez.

But that trial occurred over 30 years ago. Ms. Velasquez was one of dozens of jurors that the prosecutor, David Schwartz, questioned during voir dire. Any notes he may have had about the potential jurors are probably long gone. It is also not clear that Schwartz would recall many details of this three-decade-old case: He was admitted to the bar in 1976 and likely tried hundreds of cases during his long

---

[3] The majority reads the Nevada Supreme Court's decision differently, relying on the State's concession that it believes that the court had relied on the (valid) exclusions of Ms. Samules and Ms. Smith in deciding whether there was a prima facie case of discrimination in striking Ms. Velasquez. Maj. Op. 15-16. In construing the Nevada Supreme Court's opinion, we should not be bound by the state attorney general's interpretation, and I would not adopt that reading.

career as a deputy district attorney. Her voir dire questioning was not all that long or notable, either, such that it would remain lodged in his memory years later.

It thus may well be that the prosecutor will not remember why he chose to strike Ms. Velasquez. If that happens, it will likely mean that Doyle's conviction will be vacated. Even worse, it may be difficult to retry him, given that three decades have passed. Witnesses may have died, and forensics evidence implicating Doyle may no longer exist. Doyle may escape his death sentence and walk out of prison.

It should not be this way. Our habeas jurisprudence has created perverse incentives for lawyers to scour the record for potential ambiguities or technical errors, and to ask for a seemingly modest remedy (such as an evidentiary hearing). But in reality, that may lead to a "get out of jail" card, given the practical difficulty of retrying a case decades later.

We were led astray in 1953 when the Supreme Court in *Brown v. Allen* expanded habeas to allow state prisoners to collaterally attack convictions based on any constitutional ground. 344 U.S. 443 (1953). Before *Allen*, the Court viewed habeas petitions much more narrowly considering its historical pedigree.

The so-called Great Writ was born out of thirteenth century English arrest practice. William F. Duker, *The English Origins of the Writ of Habeas Corpus: A Peculiar Path to Fame*, 53 N.Y.U. L. Rev. (1978) 983, 984–1002; Judith Farbey et al., *The Law of Habeas Corpus* 2 (3d ed. 2011). Courts used various writs declaring "habeas corpus" to demand the presence of litigants at both civil and criminal proceedings. Paul D. Halliday, *Habeas Corpus from England to Empire* 29 (2010). But it was also a tool for competing tribunals (and later, the Crown and Parliament) to

vie for jurisdiction. Farbey, *supra*, at 4–6; Duker, *supra*, at 1006–07; Jack Goldsmith et al., *Hart and Wechsler's the Federal Courts and the Federal System* 1695 (8th Edition 2025). By the Fourteenth Century and beyond, detainees began using the writ to challenge their detentions on jurisdictional grounds—but not on the merits. Duker, *supra*, at 1004–06; Dallin H. Oaks, *Legal History in the High Court—Habeas Corpus*, 64 Mich. L. Rev. 451, 453–56 (1966).

After the English Civil War, the Cromwell Protectorate liberalized the writ to protect debtors while also denying courts the power to question the government's detentions. Duker, supra, at 1037–39. The monarchy returned in 1660, and parliamentarians soon proposed legislation to reestablish habeas corpus protections. *Id.* at 1042–43. They objected to the Crown's arbitrary detention of subjects, especially the transportation of detainees to islands outside the courts' jurisdiction. *Id.* at 1043–45. Years of debate culminated in the Habeas Corpus Act of 1679. 31 Car. 2, c. 2; Farbey, *supra*, at 16–17. It reinforced the writ as a tool for countering detention by the Crown, but it did little to prevent arbitrary detention by Parliament itself through bills of attainder. Duker, *supra*, at 1050–53.

In our Republic, Congress codified habeas corpus—which is mentioned in the Suspension Clause of the U.S. Constitution—in the Judiciary Act of 1789. Act of September 24, 1789, ch. 20 § 14, 1 Stat. 73, 82; *see also* U.S. Const. art. I, § 9, cl. 2. At first, federal courts' habeas power was limited to prisoners under federal confinement. Even within that narrow scope, federal courts stayed in line with English tradition and limited the writ to cases in which the lower federal tribunal or officer lacked proper jurisdiction. *Ex parte Kearney*, 20 U.S. (7 Wheat) 39, 41 (1822). In short,

"the writ was simply not available at all to one convicted of a crime by a court of competent jurisdiction." *Edwards v. Vannoy*, 593 U.S. 255, 277 (2021) (Thomas, J., concurring) (quoting Paul M. Bator, *Finality in Criminal Law and Federal Habeas Corpus for State Prisoners*, 76 Harv. L. Rev. 441, 465–466 (1963)).

In 1867, Congress expanded the habeas statute to allow federal courts to review state detentions. Act of Feb. 5, 1867, ch. 28, § 1, 114 Stat. 385–86 (1867). But federal courts still only exercised habeas review where the detention was without jurisdiction. Samuel T. Spear, *The Law of the Federal Judiciary: A Treatise on the Provisions of the Constitution, the Laws of Congress, and the Judicial Decisions Relating to the Jurisdiction of, And Practice And Pleading in the Federal Courts* 624 (New York, Baker, Voorhis & Co. 1883); *Wright v. West*, 505 U.S. 277, 285 (1992). Over time, the Supreme Court gradually expanded the number of claims "deemed to be jurisdictional for habeas purposes." *Wright*, 505 U.S. at 285. Yet there was still "no room to grant relief simply because a state court made an error of law." *Edwards*, 593 U.S. at 278 (Thomas, J., concurring).

A sea change occurred in *Brown v. Allen*. 344 U.S. 443 (1953). There, the Supreme Court held that federal courts sitting in habeas can and should "relitigate the merits of federal constitutional issues" decided by state courts. Goldsmith, *supra*, at 1558. The floodgates opened during the Warren and Burger Courts as an expanded habeas coincided with expansive constitutional protections for criminal defendants. *Id.*; *Edwards*, 593 U.S. at 278 (Thomas, J., concurring). In response, Congress passed AEDPA in 1996 to stem the tide of habeas claims and to restrain runaway federal review of state convictions. Pub. L.

No. 104–132, 110 Stat. 1214; *Edwards*, 593 U.S. at 280 (Thomas, J., concurring).

In modern practice, habeas amounts to another bite at the apple for state criminal defendants, who use federal courts to second-guess decisions made by state courts. Not surprisingly, federal courts suffer from a major backlog of habeas petitions. Marc D. Falkoff, *The Hidden Costs of Habeas Delay*, 83 U. Colo. L. Rev. 339, 372 (2012) (showing an increase of undecided federal habeas petitions culminating in 15,824 open petitions in 2008). Habeas petitions often take years to make their way through the federal courts, even after AEDPA's passage. United States Courts, Federal Judicial Caseload Statistics 2024, https://www.uscourts.gov/data-news/reports/statistical-reports/federal-judicial-caseload-statistics/federal-judicial-caseload-statistics-2024 (last visited Oct. 6, 2025).

As shown in our case, habeas petitions in death penalty cases too often become a device for delay or denial of justice. Doyle's state murder trial occurred three decades ago. Given his confessions and forensic evidence, a jury found him guilty and state appellate courts repeatedly affirmed his conviction. Yet thirty years later, we are now ordering a new evidentiary hearing to probe whether the deputy district attorney remembers his reason for striking a single juror. And it may lead to Doyle's conviction and death sentence being vacated.

Habeas has an honorable heritage: It is a powerful equitable writ to question improper and arbitrary detentions. But it is ill-suited, as are the federal courts, to relitigate matters first decided by state courts of competent jurisdiction decades ago. The Great Writ should not be reduced to a tactical tool of federal flyspecking even the most minute

decisions made by state trial courts and imposing delays that tilt in favor of felons whose guilt is not in doubt.

I respectfully dissent in part.